STATE OF CONNECTICUT *v.* DANIEL SANTIAGO
(SC 16918)

Sullivan, C. J., and Norcott, Katz, Palmer and Zarella, Js.

Argued January 13—officially released June 22, 2004

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Victor Carlucci, Jr.*, assistant state's attorney, for the appellant (state).

*Darcy McGraw*, special public defender, for the appellee (defendant).

*Opinion*

SULLIVAN, C. J. The defendant, Daniel Santiago, was convicted of manslaughter in the first degree with a

firearm in violation of General Statutes §§ 53a-55 (a) (1)[1] and 53a-55a (a)[2] and assault in the first degree in violation of General Statutes § 53a-59 (a) (1)[3] following a jury trial. The defendant appealed from his conviction to the Appellate Court claiming, inter alia, that the trial court had deprived him of a fair trial by permitting the prosecutor to engage in misconduct during cross-examination of the defendant and during closing argument.[4] *State* v. *Santiago*, 73 Conn. App. 205, 207–208, 807 A.2d 1048 (2002). The Appellate Court held that the prosecutor had engaged in misconduct that deprived the defendant of his right to a fair trial. Id., 208. Accordingly, the Appellate Court reversed the judgment of the trial court and ordered a new trial. Id.

We granted the state's petition for certification to appeal from the Appellate Court's decision, limited to the following question: "Did the Appellate Court prop-

---

[1] General Statutes § 53a-55 provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

[3] General Statutes § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[4] The defendant raised five claims in the Appellate Court. On the claim of prosecutorial misconduct, the Appellate Court reversed the judgment of the trial court and ordered a new trial. The Appellate Court addressed three additional claims because they were likely to arise on remand, but declined to reach the defendant's final claim, which challenged the trial court's instruction to the jury regarding intent with respect to the charge of manslaughter in the first degree with a firearm, because it was not likely to arise on remand. *State* v. *Santiago*, 73 Conn. App. 205, 208, 246, 807 A.2d 1048 (2002).

erly conclude that the state engaged in prosecutorial misconduct, and that the misconduct deprived the defendant of a fair trial?" *State* v. *Santiago*, 262 Conn. 939, 815 A.2d 673 (2003). We conclude that although some of the prosecutor's actions constituted misconduct, in the context of the whole trial, the defendant was not deprived of his constitutional right to a fair trial. We therefore reverse the judgment of the Appellate Court.

The opinion of the Appellate Court set forth the following facts that the jury reasonably could have found. "On November 26, 1997, the victim's brother, Craig Pitts, saw the victim, Barrett Applewhite, and the defendant having 'a few words' outside of an apartment building at 39 Wadsworth Street, Hartford. About one week earlier, Applewhite had 'fronted' the defendant cocaine to sell, and the defendant had agreed to pay Applewhite $500 after he sold the drugs. Although Pitts did not know what was said, the situation did not appear to him to be very serious, and Applewhite and the defendant soon went their separate ways. Afterward, Applewhite told Pitts that the defendant was 'crazy' and that he did not know what was wrong with him, but he did not give any details.

"That evening, Applewhite, Michael Ibscher and Stephen Gomes drove to 39 Wadsworth Street to visit Jessica Gonzalez and Maureen Jackson. After a while, they decided to take Applewhite and a two year old child who was visiting Jackson to the child's home on Franklin Avenue, to drop off Gonzalez' friend, Rocio Castro, at her house and then to drive to Massachusetts to purchase liquor. They entered a Lincoln Navigator sport utility vehicle that was parked in front of the building. Ibscher drove, Applewhite sat in the front passenger seat and Gomes, Castro, Gonzalez and Gonzalez' cousin, Jennifer Colon, sat in the backseat. As they drove away from the building and proceeded along Wadsworth

Street, Applewhite received a call on his cellular telephone informing him that they had forgotten to bring the two year old child with them. Ibscher thereupon backed up the vehicle all the way to the front of 39 Wadsworth Street and parked. Jackson brought the child downstairs to the vehicle and put her on Gomes' lap.

"At about that same time, the defendant, wearing dark pants and a black hooded sweatshirt with the hood up, crossed Wadsworth Street and walked to the parked vehicle. He looked in the front passenger window directly at Applewhite and started 'talking junk,' saying, 'What? What?' Applewhite responded, 'What's your problem?' and asked why the defendant had approached the vehicle. Applewhite then said to the others, 'Let me see what's wrong with that [expletive].' Applewhite opened the door and stepped out of the vehicle to the sidewalk. He told the defendant that he was acting as if they had backed up the vehicle because of him, but that was not the case. He also told the defendant that they had no problem with him. The defendant, still facing Applewhite, moved toward the rear of the vehicle, saying, 'What? What?' Applewhite followed the defendant, reiterating that they had not backed up because of him and that he should leave.

"Ibscher, noticing that the defendant was 'agitated,' decided to join Applewhite to help prevent any problems. Ibscher exited the vehicle, walked to Applewhite and told him to relax, that it was a holiday and that they did not need any trouble. Neither he nor Applewhite were armed, and there were no weapons in the vehicle. Sensing that Applewhite would not advance on the defendant, but merely would discuss the matter with him, Ibscher moved a few feet behind Applewhite. The defendant, however, kept saying, 'What? What?' and appeared to be agitated, upset and dazed.

"At that time, Applewhite and the defendant were standing about eight to ten feet apart. Although neither Applewhite nor Ibscher moved toward the defendant, he suddenly pulled out a black automatic handgun from his sweatshirt pocket and began shooting at Applewhite because he [said he] saw Applewhite reach 'into his waist.' Applewhite immediately turned away from the defendant and started to run toward the building at 39 Wadsworth Street, but he was shot in the back. Ibscher told the defendant that he was 'crazy,' and the defendant 'swiveled' toward Ibscher and shot him, hitting him in the leg as he was running through an alley to the parking lot next to the building. In total, the defendant fired six or seven shots in rapid succession. After the defendant's automatic gun clicked twice, the defendant turned and ran across the street and along a pathway between 54 and 60 Wadsworth Street toward a public housing project.

"In the meantime, Gomes, concerned about the safety of the women and the child, got into the driver's seat of the vehicle and sped off. They dropped off Castro at her house, called the police and drove to Franklin Avenue to drop off the child. While on Franklin Avenue, the police stopped and searched the vehicle and questioned the remaining passengers.

"The police officers who had arrived at the crime scene tried to gather information from the victims and witnesses concerning the shooting. At the scene, Ibscher identified the shooter as 'Danger.' [Applewhite and Ibscher were taken to the hospital for treatment of their injuries. Applewhite died in the hospital from his injuries the next morning.] By running that alias through a computer and by the process of elimination, the police were able to identify the defendant as a possible suspect. Thereafter, Ibscher, Gomes, Gonzalez and Castro all separately identified the defendant from a photographic array. On November 29, 1997, the police

obtained a warrant for the defendant's arrest and sent 'wanted' flyers to the news media.

"On December 1, 1997, the defendant turned himself in to the Hartford police. He agreed to be interviewed and gave a statement to the police, admitting that he shot Applewhite and Ibscher but claiming that it was in self-defense. Thereafter, the defendant was arrested. After a jury trial, the defendant was convicted of manslaughter in the first degree with a firearm and assault in the first degree. He was sentenced to a total effective term of sixty years imprisonment." *State* v. *Santiago,* supra, 73 Conn. App. 208–11. Additional facts will be set forth as necessary.

Although the defendant had not properly preserved his claims at trial, the Appellate Court reviewed his claims pursuant to *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). *State* v. *Santiago,* supra, 73 Conn. App. 212. Under *Golding,* "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding,* supra, 239–40. This court, however, has determined that the *Golding* test is superfluous in prosecutorial misconduct cases because the due process analysis employed in prosecutorial misconduct cases, pursuant to *State* v. *Williams,* 204 Conn. 523, 539–40, 529 A.2d 653 (1987), embodies the third and fourth prongs of *Golding,* i.e., whether a constitutional violation occurred and whether it was harmful. *State*

v. *Stevenson*, 269 Conn. 563, 572–75, 849 A.2d 626 (2004). Therefore, we will not apply the *Golding* test to the defendant's claims of prosecutorial misconduct, as our due process analysis will adequately address whether any unpreserved claims are of constitutional magnitude requiring a new trial.

The state claims on appeal that the Appellate Court improperly concluded that: (1) the prosecutor violated the principles set forth in *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), when he compelled the defendant to comment on the veracity of other witnesses during cross-examination and implied during rebuttal argument "that to find the defendant not guilty, the jury must find that the state's witnesses had lied"; *State* v. *Santiago*, supra, 73 Conn. App. 218; (2) the prosecutor repeatedly had expressed his personal opinion during closing argument; id.; and (3) the prosecutor improperly had appealed to the jury's passions, emotions and prejudices by making numerous inappropriate comments and by continuously referring to the defendant by his nickname "Danger." Id., 222, 227. The state also claims that the Appellate Court improperly concluded that "the cumulative effect of the prosecutor's misconduct so infected the proceedings as to deprive the defendant of his right to a fair trial." Id., 230–31.

Before addressing the merits of these claims, we set forth the general principles that guide our review of prosecutorial misconduct claims. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . [M]oreover . . . [a defendant is not entitled to prevail when] the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern

of conduct repeated throughout the trial. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial. . . .

"As we previously have recognized, prosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established

rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . .

"Thus, the prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . A prosecutor also may not appeal to the emotions, passions and prejudices of the jurors . . . or otherwise inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence. . . .

"Prosecutorial misconduct [also] may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. . . .

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included

among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 161–64, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

"Just as the prosecutor's remarks must be gauged in the context of the entire trial, once a series of serious improprieties has been identified we must determine whether the totality of the improprieties leads to the conclusion that the defendant was deprived of a fair trial. . . . Thus, the question in the present case is whether the sum total of [the assistant state's attorney's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 460, 832 A.2d 626 (2003). We now turn to our analysis of each of the state's claims.

I

THE PROSECUTOR'S CROSS-EXAMINATION OF THE DEFENDANT AND EMPHASIS OF THAT TESTIMONY DURING CLOSING ARGUMENT

The state first claims that the Appellate Court improperly determined that certain questions put to the defendant by the state during cross-examination were improper under *State* v. *Singh*, supra, 259 Conn. 693, because they asked the defendant to comment on the

veracity of other witnesses. The state also argues that the Appellate Court improperly determined that the prosecutor impermissibly emphasized the defendant's answers to these questions during closing argument. We agree in part.

We begin by setting forth certain additional facts. Because the defendant could not read or write, he gave the police an oral statement after his arrest. A detective typed the statement into a computer and then read it aloud for the defendant to verify. When the defendant testified at trial, portions of his testimony contradicted the statement that he had given to the police. On cross-examination, the prosecutor asked the defendant the following questions pertaining to one of the discrepancies:

"[The Prosecutor]: In your statement you said you knew people were in the car.

"[The Defendant]: I didn't say that. The officer wrote that.

"[The Prosecutor]: The officer wrote that. You didn't say that because he put words in your mouth?

"[The Defendant]: Yes.

"[The Prosecutor]: Pardon?

"[The Defendant]: Yes.

"[The Prosecutor]: So where you don't agree with the officer, he put words in your mouth, is that correct?

"[Defense Counsel]: Objection. That's argumentative.

"[The Prosecutor]: I'm not arguing, Your Honor. I'm asking the question. It's proper cross.

"The Court: Counsel, this is cross-examination. Some latitude is allowed.

"[Defense Counsel]: Fair enough.

"The Court: Some.

"[The Prosecutor]: So where you don't agree with the officer he put words in your mouth?

"[The Defendant]: At that time I was—I was not thinking right. He was just asking me questions and I was just saying yes or no, yes and no."

The second group of questions complained of by the defendant pertains to whether the defendant had approached the victim's vehicle. Other witnesses, including Ibscher, Gonzalez and Castro, testified that the defendant had approached the victim's vehicle. The defendant testified that he had not. The prosecutor asked the following questions about this discrepancy:

"[The Prosecutor]: . . . And did you ever approach the vehicle?

"[The Defendant]: Nope.

"[The Prosecutor]: Okay. You heard all the testimony?

"[The Defendant]: Yes.

"[The Prosecutor]: They said you approached?

"[The Defendant]: Yes.

"[The Prosecutor]: Okay. They were all lying?

"[The Defendant]: Yes."

During his rebuttal argument, the prosecutor stated: "And did Michael Ibscher lie? Did all these witnesses get together and lie? The police lied? That's what they want us to believe."

The Appellate Court found that both groups of cross-examination questions required the defendant to comment on the veracity of other witnesses, which was improper under this court's holding in *State* v. *Singh*, supra, 259 Conn. 693. *State* v. *Santiago*, supra, 73 Conn.

App. 218. The Appellate Court also determined that the prosecutor improperly had emphasized the defendant's answers to these questions during his closing argument, which "implied, in essence, that to find the defendant not guilty, the jury must find that the state's witnesses had lied." Id.

The state claims that the first group of questions, about the police putting words in the defendant's mouth, did not violate *Singh*, because the questions did not pertain to the veracity of the police officer's testimony during the trial, but rather pertained to the accuracy of the police officer's transcription of the defendant's statement before the trial. The state also claims that the prosecutor's comments during rebuttal were not improper because they did not imply that to find the defendant not guilty, the jury had to find that the state's witnesses had lied. The state concedes that the second group of questions, in which the prosecutor asked the defendant if all the other witnesses were lying, was improper, but argues that it did not constitute prosecutorial misconduct because: (1) *Singh* held that such questions were improper only in an evidentiary sense not in a constitutional sense; and (2) there was no reason for the prosecutor to know that such questions were improper because, at the time of the trial, *Singh* had not been decided and several other jurisdictions allowed such questions.

In *Singh*, the prosecutor compelled the defendant to comment on the veracity of other witnesses' testimony and emphasized the defendant's response during closing argument. *State* v. *Singh*, supra, 259 Conn. 704–706. We concluded that "a witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong." Id., 712. We also noted that "questions that ask a defendant to comment on another witness' veracity invade the province of the jury . . . have no probative value and are improper and argumentative

because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." (Citations omitted; internal quotation marks omitted.) Id., 707–708. We further stated that, "questions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. . . . A witness' testimony, however, can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved . . . such as misrecollection, failure of recollection or other innocent reason." (Citations omitted; internal quotation marks omitted.) Id., 708. Finally, we concluded that "closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are similarly improper"; id., 712; because "[t]his form of argument . . . involves a distortion of the government's burden of proof." (Internal quotation marks omitted.) Id.

A

We begin our analysis in the present case by addressing the second group of questions, in which the prosecutor asked the defendant whether all of the state's witnesses were lying when they testified that the defendant had approached the victim's vehicle. The state argues that prosecutorial misconduct must be either purposeful or so egregious that the prosecutor should have known that his conduct was improper at the time of trial.[5] The state concedes that this group of questions was improper under *Singh*, but argues that the questions did not constitute misconduct because *Singh* had not been decided at the time of trial; there-

---

[5] To the extent that the state's argument suggests that the misconduct here is not serious enough to overcome the weight due the prosecutor's good faith, we address the seriousness of all improprieties during our due process analysis. See part V of this opinion.

fore, the prosecutor had no reason to know that such questions were improper. We address this issue first because our acceptance of the state's argument would severely limit the scope of *Singh*.

The state cites *State* v. *Couture*, 194 Conn. 530, 563, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985), *State* v. *Hafner*, 168 Conn. 230, 251, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975), and *State* v. *Butler*, 55 Conn. App. 502, 508, 739 A.2d 732 (1999), aff'd, 262 Conn. 167, 810 A.2d 791 (2002), in support of its argument that, if the prosecutor acted in good faith, the conduct in question must have been seriously egregious to constitute prosecutorial misconduct. We conclude that the state's reliance on these cases is misplaced. We rejected a similar argument, based on *Hafner* and *Couture*, in *State* v. *Ceballos*, 266 Conn. 364, 381–82, 832 A.2d 14 (2003). In that case we held that "lack of bad faith on the part of the state's attorney in his questions and arguments that violated *Singh* is irrelevant to the determination of whether they were improper." Id., 382. The state also ignores the well settled law that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor." *State* v. *Reynolds*, supra, 264 Conn. 161. Accordingly, we disagree that *Singh* is inapplicable to the present case merely because the prosecutor may not have known that such conduct was inappropriate.

In any event, we are not persuaded that the prosecutor was unaware of the impropriety of his question. This court noted in *Singh* that the evidentiary rule that it is improper to ask a witness to comment on another witness' veracity was "well established." *State* v. *Singh*, supra, 259 Conn. 706. We also considered and rejected an exception to that rule, adopted in a minority of jurisdictions, allowing comments on a witness' veracity

"when the defendant's testimony is the opposite of or contradicts the testimony of other witnesses, thereby presenting a basic issue of credibility . . . [that *cannot*] be attributed to defects or mistakes in a prior witness' perception or inaccuracy of memory, rather than to lying." (Emphasis in original; internal quotation marks omitted.) Id., 710. The prosecutor reasonably could not have believed that such an exception would be adopted as the law of this state and, therefore, had reason to know the impropriety of asking the defendant whether all of the state's witnesses were lying.

The state also attempts to limit the scope of *Singh* by claiming that asking a defendant to comment on the veracity of other witnesses is solely an evidentiary issue that does not always constitute prosecutorial misconduct. The state contends that, by holding that *Singh* violations are automatically prosecutorial misconduct, this court sets a dangerous precedent that transforms commonplace evidentiary errors into serious constitutional violations. We disagree.

The state's attempt to pigeonhole *Singh* violations as purely evidentiary matters is misguided. In *Singh*, we found that the prosecutor's improprieties, including the prosecutor's question asking the defendant to comment on the veracity of other witnesses, were so prejudicial to the defendant as to deprive him of a fair trial. Id., 723–24. Thus, it is the severity of the misconduct, considered in the context of the specific facts and circumstances of a particular case, as opposed to the intrinsic nature of the impropriety, that determines whether an impropriety is evidentiary or of constitutional magnitude.[6]

---

[6] This is supported by our recent determination in *State* v. *Thompson*, supra, 266 Conn. 452–56, that the trial court's failure to strike a question asking one witness about the reliability of another witness, a *Singh* violation, was harmless evidentiary error; whereas, the prosecutor's comment during closing argument that the jury would have to believe that witnesses were lying in order to find the defendant not guilty, another *Singh* violation, was improper but not of constitutional magnitude. Id., 469–71, 486.

## B

We next consider whether the first group of questions, regarding the inconsistencies between the defendant's police statement and his testimony during trial, was improper within the parameters established by this court in *Singh*. We agree with the state that these questions were not improper. Asking the defendant whether the police "put words in his mouth" did not require him to comment on the veracity of any other witness. Rather, the questions solely concerned the accuracy of the transcription of the defendant's statement by the police detective. The detective who took the statement did not testify that he had transcribed the defendant's statements verbatim. Thus, by asking the defendant to characterize the transcription, the prosecutor was not asking the defendant to impugn the detective's testimony. Accordingly, we conclude that the first set of questions was not improper under *Singh*.

## C

We next address the prosecutor's comments during closing argument. The state argues that the prosecutor was not suggesting that to acquit the defendant the jury had to find that the state's witnesses were lying. We agree. The substance of the prosecutor's remarks is distinguishable from that in *Thompson* and *Singh*. In *Thompson*, the prosecutor stated: "For you to believe that the defendant is innocent, you must believe that . . . [the state's witnesses] are both lying. You must believe that when they got up on the stand and took that oath they committed perjury." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 470. In *Singh*, the prosecutor stated: "So everyone else lies. [The witnesses] all must be lying because you're supposed to believe this defendant . . . . Again, remember that if you buy the argument that [the witness] couldn't have done it, couldn't have seen what

he says he saw, then you have to conclude that [he] lied." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 705–706. In this case, it was the defendant who initially suggested that the witnesses were lying, not the state. The prosecutor was merely summarizing the defendant's position when he stated: "[D]id Michael Ibscher lie? Did all these witnesses get together and lie? The police lied? *That's what they want us to believe.*"[7] (Emphasis added.) Accordingly, we conclude that these particular comments during closing argument were not improper under *Singh*.

## II

### THE PROSECUTOR'S EXPRESSIONS OF PERSONAL OPINION DURING CLOSING ARGUMENT

The state next claims that the Appellate Court improperly concluded that the prosecutor expressed his personal opinion during closing argument. We agree in part.

At the beginning of his closing argument, the prosecutor stated: " 'I'm summarizing all the various witnesses' testimony from my perspective and [the] evidence that went in.' He went on to state: 'Now, the defendant, as he's walking, has this attitude. He wasn't scared. You know why he wasn't scared? Because he had this gun in his hand in his pocket. He wasn't afraid. He knew what he was going to do. . . . He says he was scared. He was not scared. I submit to you, Danger wasn't

---

[7] The defendant suggested during his closing argument that Applewhite's brother and friends had not testified truthfully, that the state's other witnesses were not trustworthy because they did not come forward immediately after the shooting, and that Ibscher had a motive to lie to protect himself because of his own involvement in the events leading up to the shooting. The defendant's closing argument did not suggest that the police lied, but rather that they had performed a conclusory and incomplete investigation. The fact remains, however, that the state was not suggesting that the only way in which to acquit the defendant was to believe that the state's witnesses had lied.

scared. Danger is his name, he had a gun, he was on a mission, and he was going to complete his mission. . . . Danger was about to injure someone and kill.' " *State* v. *Santiago*, supra, 73 Conn. App. 219.

"Shortly thereafter, the prosecutor . . . argued: '[The defendant] had the murder weapon under the hoodie, under the hoodie, in the hoodie. *It doesn't matter*. It was on his waist. He clearly says he pulled the weapon and he fired. *Was there intent there? Yes, I say there was*. He knew what he was doing. [He] wasn't frightened. He had a mission. The mission was to kill Mr. Applewhite.' " (Emphasis added.) Id., 220. The Appellate Court determined that "the prosecutor blatantly was conveying to the jury his personal opinion that the defendant intended to kill Applewhite and was dedicated to his preconceived 'mission' to do so" and that the prosecutor "unmistakably suggested to the jury the prosecutor's opinion as to who was the initial aggressor." Id.

The Appellate Court noted that "[f]urther on in his closing argument, the prosecutor, despite conceding that credibility was for the jury to determine, nevertheless gave his opinion as to the defendant's credibility when he stated: 'Even yesterday, his testimony, parts of his statement, were lies, he said. Did he also lie in his testimony to help himself? I don't know. You determine that. *I question his credibility*, but that's up to you to determine.' . . . Later, the prosecutor elaborated on that theme by stating: '[The defendant] [c]an't read or write, but can spell Danger. . . . Danger can spell his name, and he can lie to change facts. That's by his testimony. *Danger knows what he did. We know what he did*.' " (Emphasis in original.) Id.

In concluding his closing argument, the prosecutor stated: "A man is dead and one is injured. This [gun] did it, and it was in [the defendant's] hands. *Doesn't*

*matter, the patterns of guns,* whether he fired it Hollywood style, TV style, whether he fired it one-handed, whether he says he didn't move the gun or not. Two people were shot, one was killed. *It doesn't matter how he fired it or whatever.* . . . He admitted he shot both victims and he fled the scene. . . . All the state's witnesses point to Danger. He committed the crime, he knows he was the aggressor, he could have retreated, he was not justified in using deadly force, not at all. It doesn't matter who they are, these victims, or what they did prior to the day of [the shooting]." (Emphasis added; internal quotation marks omitted.) Id., 221.

During rebuttal, the prosecutor stated: "The defendant admitted he shot. *I don't care where the truck was.* A man is dead. He got shot. He was killed. . . . If these men were streetwise, as they're saying, and had a gun, they would have used it, I submit to you. They didn't have a gun. . . . I'm not denying the records that these individuals had, but they weren't out to do any harm to [the defendant].

\* \* \*

"Whether [the victims] were close or far away, *it doesn't matter.* They were shot by the aggressor. . . . [The defendant] could have left. [The defendant] did not retreat. [The defendant] . . . was not justified in firing those shots." (Emphasis added; internal quotation marks omitted.) Id., 221–22.

The state argues that the mere use of personal pronouns by the prosecutor did not transform the state's arguments into an expression of the prosecutor's personal opinion because: (1) qualifying language during the prosecutor's summation made it clear to the jury that he was presenting the state's interpretation of the evidence in a light most favorable to its case; (2) the prosecutor did not imply that he had knowledge of matters not in evidence or that the jury should rely on

his judgment; and (3) there was nothing improper about the prosecutor's arguments as to what evidence was relevant and what was not.

We begin our analysis by reviewing the relevant law guiding our inquiry into whether the prosecutor improperly stated his personal opinion to the jury. It is well settled that, "in addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Robinson*, 227 Conn. 711, 746, 631 A.2d 288 (1993); see also *State* v. *Brown*, 256 Conn. 291, 309–10, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001). Moreover, "[i]t does not follow . . . that every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 310.

"The parameters of the term zealous advocacy are also well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . *State* v. *Whipper*, [258 Conn. 229, 263, 780 A.2d 53 (2001)]; see also A.B.A., Standards for Criminal Justice, Prosecution Function and Defense Function (3d Ed. 1993) standard 3-5.8 (b), p. 106." (Internal quota-

tion marks omitted.) *State* v. *Singh*, supra, 259 Conn. 713.

Although prosecutors should avoid the use of the personal pronoun "I," we agree with the state that the use of the word does not, without more, transform an otherwise proper closing argument into an impermissible expression of personal opinion. "[U]se of the personal pronoun I is a normal and ordinary use of the English language. If courts were to ban the use of it, prosecutors would indulge in even more legalese than the average lawyer, sounding even more stilted and unnatural." (Internal quotation marks omitted.) *State* v. *Dillard*, 66 Conn. App. 238, 260–61, 784 A.2d 387, cert. denied, 258 Conn. 943, 786 A.2d 431 (2001). We do not agree, however, that this principle applied to all of the prosecutor's statements and that all of his statements merely suggested reasonable inferences to be drawn from the evidence presented.[8] *State* v. *Vasquez*, 79 Conn. App. 219, 233, 830 A.2d 261 ("prosecutor may . . . argue to the jury that the *evidence* and the reasonable inferences to be drawn therefrom should lead the jury to a conclusion as to the credibility of witnesses" [emphasis in original; internal quotation marks omitted]), cert. denied, 266 Conn. 918, 833 A.2d 468 (2003).

With respect to the prosecutor's discussion during closing argument about what evidence was and was not relevant, we conclude that his statements were indirect expressions of his personal opinion.[9] These arguments

---

[8] These conclusions, without reference to facts in evidence, suggested directly or indirectly that the prosecutor was giving the jury his personal opinion of the case.

[9] The closing argument statements include the following: "Doesn't matter, the patterns of guns, whether he fired it Hollywood style, TV style, whether he fired it one-handed, whether he says he didn't move the gun or not. . . . It doesn't matter how he fired it or whatever. . . . He admitted he shot both victims and he fled the scene. . . . It doesn't matter who they are, these victims, or what they did prior to the day of [the shooting]." The rebuttal statements include: "I don't care where the truck was. . . . Whether [the victims] were close or far away, it doesn't matter."

did not suggest reasonable inferences to the jury based on facts in evidence but, instead, constituted bare conclusions that indirectly suggested that the assertions were the personal opinion of the prosecutor.[10] Although arguing about the relevancy of certain evidence may be entirely proper during closing argument, such arguments become improper expressions of the prosecutor's personal opinion when they are rendered in a declaratory manner without any connection to the facts of the case.[11]

We next turn to the direct expressions of the prosecutor's personal opinion. The prosecutor stated: "I question [the defendant's] credibility, but that's up to you to determine." Although the second clause of this statement appears to have been an attempt to cure any impropriety in the first clause, there is no question that the first clause improperly expressed the prosecutor's personal opinion as to the credibility of the defendant. The prosecutor also directly expressed his personal opinion when he stated, "Was there intent there? Yes, I say there was." The implication was that the prosecutor personally believed that the defendant intended to kill the victim, and that the jury should agree. The state attempts to analogize these comments to those in *State v. Hampton*, 66 Conn. App. 357, 372–73, 784 A.2d 444, cert. denied, 259 Conn. 901, 789 A.2d 999 (2001), that the court concluded were not improper. In *Hampton*, unlike the present case, the prosecutor indicated throughout that he was expressing the *state's* opinion,

_____

[10] We note that these types of statements do not fall squarely within the categories of improper comments on the credibility of witnesses or the guilt of the defendant; however, we agree with the Appellate Court that such statements create an undue risk of usurping the fact-finding role of the jury. *State v. Santiago*, supra, 73 Conn. App. 222.

[11] Contrary to the state's claim, the prosecutor's conclusions, which were void of any reference to the facts of the case, necessarily suggested to the jury that the prosecutor had knowledge outside the evidence and that the jury should rely on his judgment.

not his own personal opinion. Id. In this case, the prosecutor stated at the beginning of his closing argument: "This is my argument; this is my view; my perspective for our position, the state's position, in regard to this case." As we stated in *Singh*, "[these] prefatory remarks do not transform an otherwise improper form of argument into a proper one. They may, however, have some bearing on our determination as to whether an improper argument was prejudicial." *State* v. *Singh*, supra, 259 Conn. 715.

We do not find the remainder of the prosecutor's statements, challenged by the defendant, to be expressions of personal opinion.[12] Instead, we conclude that these statements were arguments based on reasonable

---

[12] These statements include: "Now, the defendant, as he's walking, has this attitude. He wasn't scared. You know why he wasn't scared? Because he had this gun in his hand in his pocket. He wasn't afraid. He knew what he was going to do. . . . He says he was scared. He was not scared. I submit to you, Danger wasn't scared. Danger is his name, he had a gun, he was on a mission, and he was going to complete his mission. . . . Danger was about to injure someone and kill." The prosecutor made this comment in connection with evidence that the defendant had approached the victims' vehicle while carrying a gun and had stated: "What? What?" Ibscher testified during direct examination that " 'what, what' where I come from is an agitation type of thing of what do you—what you want? Do you want a problem?" As such, the prosecutor's statements could reasonably be inferred from those facts. Likewise, the following statements were inferences reasonably based on the evidence before the jury: "All the state's witnesses point to Danger. He committed the crime, he knows he was the aggressor, he could have retreated, he was not justified in using deadly force, not at all." "If these men were streetwise, as they're saying, and had a gun, they would have used it, I submit to you. They didn't have a gun. . . . I'm not denying the records that these individuals had, but they weren't out to do any harm to [the defendant]." The prosecutor also stated: "[The defendant] [c]an't read or write, but can spell Danger. . . . Danger can spell his name, and he can lie to change facts. That's by his testimony. Danger knows what he did. We know what he did. He consented to the search of his bedroom. He admitted that. That was his name." Although we could infer that the prosecutor improperly was commenting on both his and the jury's knowledge of an ultimate issue in the case, the defendant's guilt, the last two sentences make it evident that the prosecutor actually was commenting on the defendant's denial of his nickname "Danger" when speaking with the police.

inferences drawn from the evidence in the case, as presented by the prosecutor during his closing argument. "We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straightjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like. *State* v. *Singh,* supra, 259 Conn. 726–27 (*Borden, J.,* concurring and dissenting)." (Internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 465–66.

### III

### THE PROSECUTOR'S GRATUITOUS COMMENTS DURING CROSS-EXAMINATION OF THE DEFENDANT

We next address the state's claim that the Appellate Court improperly determined that gratuitous comments made by the prosecutor constituted prosecutorial misconduct. We disagree.

During his cross-examination of the defendant, the prosecutor made several gratuitous comments, set forth by the Appellate Court as follows: "During the state's cross-examination, the defendant testified that some of the differences between his statement to the police and his testimony at trial were because the police had put words in his mouth. In response, the prosecutor asked the defendant if the police had 'beat him up,' and the defendant answered, 'No.' Defense counsel objected on the ground that the question was inflammatory and outside the evidence. The court sustained the objection and instructed the jury to disregard the prosecutor's question because there was 'no testimony concerning

physical intimidation by the police.' The court also told the jury not to speculate 'as to what an answer would have been.'

"On another occasion during cross-examination, the following colloquy occurred:

" '[The Prosecutor]: Did you say Mr. Ibscher had a gun, too?

" '[The Defendant]: Nope.

" '[The Prosecutor]: Why did you shoot him?

" '[The Defendant]: He was in the way. He probably got shot on his own.

" '[The Prosecutor]: Oh, he was in the way.'

"At that point, the court asked the prosecutor to approach the bench. The prosecutor complied and conferred with the court off the record. The court then instructed the jury to disregard the prosecutor's comment, to concentrate on the question and issues, and that any additional comments by the prosecutor were irrelevant and 'not part of the jury's consideration.' " *State* v. *Santiago*, supra, 73 Conn. App. 223–24.

"Thereafter, the prosecutor asked the defendant whether, in his written statement to the police, he had stated that he put the clothes he was wearing during the shooting into the garbage. The defendant answered: 'I said I took them off. I never said I threw them away.' In response, the prosecutor stated: 'Oh, okay. What did you do with them?' Defense counsel immediately objected to that comment, stating: 'Again, that's the fourth time, Your Honor.' As the prosecutor began to apologize for his comment, the court interrupted and excused the jury.

"After the jury was excused, the following colloquy occurred between the prosecutor and the court:

" '[The Prosecutor]: My apologies, Your Honor. I—

" '[The Court]: Counsel, what do I have to do to get these comments to stop?

" '[The Prosecutor]: I'm—that was not—

" '[The Court]: Do I have to hold you in contempt?

" '[The Prosecutor]: No, Your Honor. I apologize to the court. I did not mean that. It was a reaction. I'm sorry.

" '[The Court]: That's why you're going to take a fifteen minute recess as well. You're going to gather your thoughts. You're going to come back and conduct a proper cross-examination without gratuitous comments, counsel. This is too important to be having gratuitous comments.

" '[The Prosecutor]: I understand, Your Honor.'

"At that point, defense counsel requested that the court impose sanctions on the prosecutor if his misconduct continued. After the jury returned to the courtroom, the court gave a curative instruction." Id., 224–25.

The state claims on appeal that: (1) the question about the beatings was warranted given the defendant's claims of coercion; (2) the other comments were not improper because they were not deliberate; and (3) the comments did not appeal to the passions or emotions of the jury. We disagree.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based

upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Citation omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 719.

We conclude that the prosecutor's question to the defendant about whether the police had beaten him during his interrogation was inflammatory and without any reasonable basis in the evidence. We do not agree with the state that the question was for the legitimate purpose of merely discovering the extent of any coercion that the defendant had complained of during direct examination. Rather, we conclude that the prosecutor's comments served only to minimize the circumstances the defendant described, namely, a lengthy delay before seeing his family and having a meal. Thus, we conclude that the question unfairly appealed to the passions, emotions or prejudices of the jury.

We similarly reject the state's argument that the prosecutor's other sarcastic comments were not deliberate. Reflexive sarcasm may be characterized as deliberate in this context. Moreover, as we have stated: "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 161. These comments exposed the jury to the prosecutor's blatant disbelief in response to the defendant's testimony and "invite[d] the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors [that were] likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 719. We conclude, therefore, that the prosecutor's gratuitous sarcastic comments did appeal to the passions, emotions and prejudices of the jury.

## IV

## THE PROSECUTOR'S USE OF THE DEFENDANT'S NICKNAME DURING CLOSING ARGUMENT

The state next claims that the Appellate Court improperly determined that the prosecutor's repeated use of the defendant's nickname, "Danger," during closing argument was improper because it appealed to the jury's emotions, passions and prejudices. We disagree.

The Appellate Court stated that "the prosecutor referred to the defendant as 'Danger' at least eighteen times in closing argument and four times in rebuttal argument." *State* v. *Santiago*, supra, 73 Conn. App. 226–27. The Appellate Court further stated, "[i]t is obvious to us that the prosecutor's purpose in referring to the defendant as 'Danger' was to portray him as a dangerous and violent person." Id., 228. Therefore, the court concluded that "[s]uch [an] ill-disguised insinuation is . . . designed solely to appeal to the jury's emotions, passions and prejudices." Id.

The state claims that it properly referred to the defendant by his nickname "Danger" because the trial court had allowed evidence of that nickname to prove identification and to show consciousness of guilt when the defendant had lied to the police about having that nickname. We do not agree that admission of the defendant's nickname for these limited purposes gave the prosecutor free reign to use the defendant's nickname during closing argument and rebuttal to imply that the defendant was a dangerous person and, therefore, likely to have been the aggressor. The state also argues that similar aliases were found insufficiently prejudicial in *State* v. *Turner*, 252 Conn. 714, 739–40, 751 A.2d 372 (2000) (use of codefendant's nickname, "Homicide," not sufficient to warrant severance), and *State* v. *Huckabee*, 41 Conn. App. 565, 573, 677 A.2d 452 (1996) (nickname "Snake" not sufficiently negative to warrant

limiting instruction). This assertion is unavailing because neither case concerned the use of a nickname during closing argument and neither case concerned the use of a nickname as a basis for prosecutorial misconduct. Further, the prosecutor did not use the defendant's nickname merely to refer to the defendant, but also incorporated it into his argument when he stated: "[R]eal danger lurked around the corner in the name of Daniel Santiago. That's who it is. That's Danger." We conclude that this use of the defendant's nickname improperly appealed to the passions, emotions and prejudices of the jury.

## V

## DUE PROCESS ANALYSIS

As we stated in *Singh*, "[t]he ultimate question is, in light of the conduct that we have concluded was improper, whether the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process. . . . This final determination requires . . . the consideration of several factors: the extent to which the misconduct was invited by defense conduct or argument, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the case, the strength of the curative measures adopted and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 723. These factors were first set forth in *State* v. *Williams*, supra, 204 Conn. 540.

We have identified four types of prosecutorial misconduct engaged in by the prosecutor in this case: (1) the *Singh* violation; (2) the prosecutor's statements of personal opinion during closing argument; (3) the prosecutor's gratuitous comments during cross-examination of the defendant; and (4) the prosecutor's use of

the defendant's nickname during closing argument. The state claims that the prosecutor's misconduct did not constitute a violation of due process because: (1) the misconduct was invited or reciprocated by defense counsel or both; (2) the misconduct was not frequent or severe; (3) the misconduct was not central to the critical issues in the case; (4) the state's case was strong; and (5) the trial court's instructions cured any impropriety. We address each claim in turn.

A

Whether the Misconduct Was Invited

The state claims that defense counsel invited the alleged instances of misconduct or responded in kind. The state provides no authority for the proposition that defense counsel's misconduct cures prosecutorial misconduct, however, and we see no reason to adopt such a rule. Accordingly, we limit our review to the claim that the misconduct was invited.

The state claims specifically that defense counsel: (1) invited the prosecutor's statements of personal opinion by stating his own personal opinion and by disparaging the credibility of the state's witnesses during closing argument; (2) invited the prosecutor's gratuitous comments by making gratuitous comments during direct examination of the defendant; and (3) invited the prosecutor to use the defendant's nickname by referring to the defendant as "Danger" during closing argument.

With respect to the prosecutor's statements of personal opinion, the state argues that the prosecutor offered his opinion about the defendant's credibility in response to the defense counsel's argument that the state's witnesses were biased. We conclude that defense counsel's attempt to persuade the jury not to believe the testimony of the state's witnesses, which undercut the defendant's theory of self-defense, did not invite

the prosecutor to express his personal opinion as to the credibility of the defendant. Defense counsel argued from the facts of the case, discussing testimony and evidence and making reasonable inferences therefrom. He did not express his personal opinion. Moreover, this court cannot conceive of any situation in which defense counsel could invite such a comment.

The state next argues that the prosecutor's gratuitous comments were invited by defense counsel's occasional use of the phrases "okay" and "all right." We simply cannot perceive how these innocuous comments could invite inappropriate gratuitous comments of the nature engaged in by the prosecutor. Finally, we note that defense counsel's use of the defendant's nickname "Danger" occurred *after* the state had already presented its closing argument. Accordingly, we conclude that the misconduct was not invited.

B

Severity and Frequency

The state argues that the misconduct was not so frequent or severe as to constitute a due process violation. We conclude that, although the misconduct was frequent, not all of it was severe. As we stated in *State v. Thompson*, supra, 266 Conn. 479, we take into consideration whether defense counsel "object[ed] to any of the improper remarks, request[ed] curative instructions, or move[d] for a mistrial." We note that defense counsel did object to one of the instances of misconduct, the gratuitous comments. Further, the trial court gave curative instructions on the gratuitous comments even before defense counsel objected to them. Accordingly, the prosecutor's gratuitous comments were severe. Defense counsel, however, did not object to the remaining three instances of misconduct: the prosecutor's statement of personal opinion; the prosecutor's

use of the defendant's nickname[13] during closing argument; and the *Singh* violation. Defense counsel's objection or lack thereof allows an inference that *counsel* did not think the remarks were severe. We, however, make the ultimate determination. We conclude that the substance of the three remaining instances of misconduct, in the context of the whole trial, was not severe.

## C
### Centrality to Critical Issues in the Case and Strength of the State's Case

The state argues that the *Singh* violation was irrelevant to the critical issue in the case, the defendant's claim of self-defense. The question concerned whether the state's witnesses had lied when they testified that the defendant had approached the victims' vehicle. We agree that the *Singh* violation did not center on a critical issue in the case. Because the question was only tenuously relevant to the issue of self-defense, it is not reasonably likely that this one question and answer affected the outcome of the trial.

With respect to the prosecutor's gratuitous comments, we agree with the state that, for the most part, they did not center on the issue of self-defense. Rather, they were improper reactions to the defendant's testimony on collateral issues.[14] The one exception is the prosecutor's gratuitous comment regarding the defendant's testimony as to why he had shot Ibscher, which arguably touched upon the issue of self-defense.

The state also argues that the prosecutor's personal opinions and use of the defendant's nickname are not

---

[13] Although defense counsel attempted to exclude the use of the defendant's nickname via a motion in limine, defense counsel made no objection to the way the prosecutor used the nickname during closing argument.

[14] These collateral issues were whether the police had coerced the defendant into giving his statement by beating him and what the defendant did with his clothing after he left the scene.

central to the critical issues in the case. Both the personal opinions and the nickname were used throughout the closing argument on a broad range of issues within the case. We conclude that both improprieties touched upon, at one or more times, the central issues in the case.

In light of the strength of the state's overall case, however, we do not believe that it is reasonably possible that any of these improprieties affected the result of the trial.[15] Unlike the state's case in *Singh*, the guilt of the defendant in the present case did not depend solely on the credibility of one eyewitness' account. In this case, there was no question that the defendant shot the victims; the only question was whether he acted in self-defense. The only evidence in support of the defendant's self-defense claim was his own testimony, which differed as to the basic facts of the incident compared with the consistent testimony of other eyewitnesses.[16] The defendant testified that he had seen Applewhite reach into his waist and grab a gun. The defendant, however, had not mentioned that fact in his statement to the police. Gomes, Gonzalez and Castro testified that they had not seen either victim with a gun. Ibscher testified that neither he nor Applewhite was carrying a gun that day and that he had never seen Applewhite with a gun. Further, there was no evidence that Applewhite fired a gun and no gun was ever found.

The state's witnesses, most notably Ibscher, indicated that the defendant had been the aggressor. This testi-

---

[15] We note that the prosecutor's use of the defendant's nickname during closing argument may well have affected the fairness of the trial if the state did not have as strong a case against the defendant.

[16] The defendant testified that he did not approach the vehicle, although four other eyewitnesses, Ibscher, Jackson, Gonzalez and Gomes, consistently testified that he had. The defendant also testified that Ibscher got out of the vehicle first, although Ibscher, Jackson, Gonzales and Gomes all testified that Applewhite had exited the vehicle first.

mony was corroborated by the fact that both victims were shot from behind. Furthermore, the state introduced evidence that the defendant ran from the scene, disposed of the clothes he wore and the gun he used during the shooting, and that he hid until morning. This evidence of his own incriminating behavior seriously undermined his defense.

## D

### Curative Instructions

Finally, we consider the effect of the court's curative instructions on the improprieties. The trial court gave curative instructions with respect to the prosecutor's gratuitous statements,[17] the prosecutor's closing argument[18] and the prosecutor's general use of the defen-

---

[17] The trial court instructed the jury with respect to the gratuitous comments as follows: "I'd ask the jury to disregard the comments. Please concentrate on the questions. Please concentrate on the answers. Any additional comments are irrelevant and are not to be part of the jury's consideration." "Ladies and gentlemen of the jury, you may all recall during the voir dire process before the trial started, I'd instructed you as to your roles as jurors, my role at the court, counsels' role in argument. Once again, you're to find the facts, draw conclusions as to the ultimate facts based upon the testimony and evidence that is introduced in the courtroom. You can't rely on guesswork, conjecture, suspicion; you can't be influenced by personal likes, dislikes, opinions, prejudices or sympathies. I'm also going to caution you, you can't be influenced by the questions or the form of questions by counsel or by counsel's demeanor in a particular case. Every witness in this case was entitled to the same consideration, the same deference, the same respect. You are to listen to every witness and judge the credibility of each witness based upon the same standard."

[18] The trial court admonished the jury prior to closing argument: "At this point all evidence has been presented to you. The lawyers are now going to make argument to you. Please bear in mind that the argument is not evidence. You can consider the argument of counsel during your deliberations, but it is not evidence." The trial court stated in its instructions to the jury after closing argument: "Certain things are not evidence and you may not consider them in deciding what the facts are. These include: one, argument and statements by lawyers. The lawyers are not witnesses. What they said during the trial or in their closing arguments is intended to help you interpret the evidence but it is not evidence. If the facts, as you remember them differ from the way the lawyers have stated them your memory of them

dant's nickname.[19] "In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 485, quoting *State* v. *Reynolds,* supra, 264 Conn. 131. There is no suggestion in the present case that the jury did not follow the trial court's general instructions. The instructions, therefore, make it unlikely that any of the prosecutor's personal opinions were so prejudicial as to affect the outcome of the trial.[20]

The trial court did not give curative instructions with respect to the *Singh* violation or the prosecutor's repeated use of the defendant's nickname throughout the closing argument. The defendant, however, objected to neither impropriety. As we stated in *Thompson,* "the defendant, by failing to bring them to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties went uncured. We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel [may not have] believe[d] that it was unfair in light of the record of the case at the time. . . . [We also recognize that] defense counsel may elect not to object

controls. Additionally, comments made by counsel during the questioning of witnesses and, in fact, the questions themselves are not evidence."

[19] The trial court instructed the jury about the use of the defendant's nickname during the state's presentation of its case as follows: "[T]here has been testimony concerning a nickname that was given to several people in the case. It's a nickname only. Accept it as that only. Draw no inferences from nicknames that might be given to people in this case."

[20] We note that the prosecutor stated at the beginning of his closing argument: "This is my argument; this is my view; my perspective for our position, the state's position, in regard to this case." This statement also helped to lessen any prejudice from the prosecutor's improper assertion of his personal opinion during closing argument.

to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument." (Internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 483–84.

We are convinced that the defendant was not deprived of his right to a fair trial because we do not find that "there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." Id., 460. We conclude that, although the prosecutor committed misconduct, the case against the defendant was strong and the only severe misconduct, the prosecutor's gratuitous comments, was adequately addressed by the trial court's instructions. The remaining misconduct was either not so egregious that defense counsel found it objectionable at the time of trial or was adequately counteracted by the trial court's instructions.

The judgment of the Appellate Court is reversed with respect to the claim of prosecutorial misconduct and the case is remanded to that court for consideration of the defendant's remaining claim.[21]

In this opinion the other justices concurred.

---

[21] See footnote 4 of this opinion.