STATE OF CONNECTICUT *v.* RAFAEL MEDRANO
(AC 31271)

DiPentima, C. J., and Robinson and Mihalakos, Js.

Argued May 24—officially released September 20, 2011

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anne Mahoney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The state charged the defendant, Rafael Medrano, with one count of murder as a principal and accessory, in violation of General Statutes §§ 53a-54a and 53a-8, and one count of carrying a dangerous weapon, in violation of General Statutes § 53-206. At trial, the jury found the defendant not guilty of murder but guilty of the lesser included offense of manslaughter in the first degree, in violation of General Statutes §§ 53a-55 (a) (1) and 53a-8, and the weapons charge. The trial court rendered judgment of conviction in accordance with the verdict.

In this appeal, the defendant claims that (1) his conviction of both manslaughter in the first degree and carrying a dangerous weapon violated the fifth amendment prohibition against double jeopardy, and (2) the prosecutor committed prosecutorial impropriety that deprived him of his right to a fair trial.[1] We hold that

---

[1] The defendant made two additional claims in his appellate brief regarding the trial court's instruction to the jury: namely, that the court erred in its instructions on the credibility of witnesses by unduly emphasizing his interest in the outcome of the trial; and, in addition, that the court erred in its instructions to the jury on the state's burden of proof beyond a reasonable doubt. The defendant conceded at oral argument that these claims were controlled by binding precedent. See, e.g., *State* v. *Williams*, 220 Conn. 385, 397, 599 A.2d 1053 (1991) (rejecting defendant's claim that trial court's remarks to jury concerning defendant's interest in outcome of case were improper); *State* v. *Bowman*, 289 Conn. 809, 811 n.2, 960 A.2d 1027 (2008) (rejecting defendant's claim that trial court's jury instruction on reasonable doubt was improper). Accordingly, we do not review the merits of those claims in this appeal.

the conviction of manslaughter in the first degree and carrying a dangerous weapon does not violate the constitutional protection against double jeopardy. We also hold that the defendant was not deprived of a fair trial as a result of prosecutorial impropriety. Accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On June 22, 2007, the defendant attended a high school graduation party at a multifamily house on New Britain Avenue in Hartford hosted by Catherine Perez. Accompanying the defendant to the party were several friends or acquaintances, including his roommate, Angelley Torres, his friend, Omar Sosa, and Edwin Candelario. The celebration devolved into turmoil when a dispute erupted amongst the partygoers. This occurred when Torres began arguing with another guest at the party after that guest pushed him. That verbal altercation escalated when Joel Quinones began yelling at and aggressively confronting Torres. In response to this display of aggression, Torres pushed Quinones. The defendant, who was standing nearby, tried in vain to stop the disagreement from escalating further. Quinones however, drew a knife, cut the defendant on the right arm, then chased Torres out of the house and into the front yard where he stabbed Torres in the back.

After witnessing Quinones stab Torres, the defendant pushed Quinones away from Torres. At this point a female partygoer hit the defendant in the shoulder with a stick. Quinones then threw his knife at the defendant, who was successfully able to dodge the oncoming weapon. Agitated by the blow to his shoulder with a stick and the knife thrown at him, the defendant chased the fleeing Quinones into the street. Quinones tripped on the corner of the sidewalk and fell to the ground as the defendant gave chase. The defendant came upon Quinones, and they struggled with each other briefly. The melee ended when the defendant stabbed Quinones

twice in the side with a pocketknife he had been carrying. The blade of the pocketknife was less than four inches long and was carried habitually by the defendant in order to perform his duties at the automotive garage at which he was employed. An associate medical examiner testified at trial that these stab wounds were the cause of Quinones' death.

After he stabbed Quinones, the defendant proceeded back up the street toward the house party where his car was parked. The defendant then fled the scene with Sosa and Torres and convened in the basement at Sosa's home. There, the defendant used alcohol to clean blood off his knife. He cleaned Torres' knife, which also was bloodstained. The defendant and Torres then placed the knives in the trunk of the defendant's car under a spare tire. During that time, the defendant telephoned his girlfriend, Mary DeJesus. He told her: "I stabbed a boy. Don't say nothing. I'll talk to you later . . . ."

The defendant was subsequently arrested and charged with the crime of murder, in count one, and carrying a dangerous weapon, in count two. After a full hearing, the case was committed to the jury, which returned a verdict of not guilty on count one but guilty of the lesser included offense of intentional manslaughter in the first degree and guilty on count two. The court rendered judgment in accordance with this finding, sentencing the defendant to incarceration for twenty years for intentional manslaughter in the first degree and for three consecutive years thereafter on the count of carrying a dangerous weapon. Additional facts will be set forth as necessary.

I

DOUBLE JEOPARDY

The defendant claims that his dual conviction of manslaughter in the first degree and carrying a dangerous

weapon violated the fifth amendment prohibition against double jeopardy. Because this claim of constitutional error was not preserved at trial, the defendant can prevail only if all of the conditions set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), are met.[2] We conclude that the defendant's right to a fair trial was not violated.

We set forth our standard of review and the principles that guide or analysis. "The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . . This constitutional provision is applicable to the states through the due process clause of the fourteenth amendment. . . . The Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy.[3] . . . This constitutional guarantee serves three separate functions: [1] It protects against a second prosecution for the same offense after acquittal. [2] It protects against a second prosecution for the same offense after conviction. [3] And it

---

[2] Pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, a defendant "can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.)

[3] "Although the Connecticut constitution contains no specific double jeopardy provision, the due process and personal liberty guarantees of article first, §§ 8 and 9, of the Connecticut constitution include protection against double jeopardy. . . .

"Article first, § 8, of the Connecticut constitution provides in relevant part: 'No person shall be . . . deprived of life, liberty or property without due process of law . . . .'

"Article first, § 9, of the Connecticut constitution provides: 'No person shall be arrested, detained or punished, except in cases clearly warranted by law.' " (Citation omitted.) *State* v. *Ferguson*, 260 Conn. 339, 360 n.13, 796 A.2d 1118 (2002).

protects against multiple punishments for the same offense [in a single trial]. . . . The defendant's claim in [the present case] implicates the last of these three functions.

"The double jeopardy analysis in the context of a single trial is a two part process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Citations omitted; internal quotation marks omitted.) *State* v. *Ferguson,* 260 Conn. 339, 360–61, 796 A.2d 1118 (2002). There is no dispute in this case that the two crimes with which the defendant had been charged arose out of the same transaction. Therefore, the sole remaining question in the double jeopardy context is whether manslaughter in the first degree and carrying a dangerous weapon are the same offense for the purpose of that analysis.

"The traditional approach to analyzing whether two offenses constitute the same offense was set forth in *Blockburger* v. *United States,* 294 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . Id., 304 . . . . In conducting this inquiry, [the court] look[s] only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Greco,* 216 Conn. 282, 291, 579 A.2d 84 (1990).

In setting forth his double jeopardy argument, the defendant specifically notes that the weapon he used to kill the victim—a pocketknife with a blade less than four inches—did not, by itself, constitute a dangerous

instrument within the meaning of § 53-206 (a)[4] and General Statutes § 53a-3 (7);[5] and, to that end, only became a dangerous weapon under that statutory language at the moment it was used to kill the victim. Here, the defendant refers to § 53a-3 (7), which defines a " '[d]angerous instrument' " as "any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ." The defendant, in other words, contends that factual circumstance rendered the pocketknife a dangerous weapon. The defendant further argues that that requisite factual circumstance did not exist until the state first established manslaughter in the first degree. Therefore, the defendant concludes that there is no element in the dangerous weapon charge that is not also contained in the manslaughter (or murder) charge—and, thus, in that sense, conviction of both crimes constitutes double jeopardy. We are not persuaded.

The *Blockburger* test requires us to examine the relevant statutes to determine whether each offense requires proof of a fact that the others do not. Manslaughter in the first degree requires (1) intent to cause serious physical injury and (2) death. See General Statutes § 53a-55 (a) (1). Carrying a dangerous weapon simply requires that one has carried a dangerous weapon or instrument. See General Statutes § 53-206 (a). Guided

---

[4] General Statutes § 53-206 (a) provides in relevant part: "Any person who carries upon his or her person any . . . knife the edged portion of the blade of which is four inches or more in length . . . or any other dangerous or deadly weapon or instrument, shall be fined not more than five hundred dollars or imprisoned not more than three years or both. . . ."

[5] General Statutes § 53a-3 provides in relevant part: "Except where different meanings are expressly specified, the following terms have the following meanings when used in this title . . . (7) 'Dangerous instrument' means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ."

by *Blockburger*, and in contradiction to the defendant's claim, manslaughter in the first degree does *not* require that one use, let alone carry, a dangerous weapon. For that matter, carrying a dangerous weapon does not require the intent element that first degree manslaughter mandates.

More specifically, we disagree with the defendant's position that the pocketknife the defendant used to stab the victim did not become a dangerous weapon within the meaning of the statute until the moment it was actually used to kill the victim. The plain reading of the statute indicates that the pocketknife was rendered a dangerous instrument sometime before the victim was killed—that is, the pocketknife became a dangerous instrument when the defendant merely *"attempted or threatened"* to use it. (Emphasis added.) General Statutes § 53a-3 (7). It does not matter that the defendant's "attempt" to stab the victim was successful. Therefore, the state did not need to establish manslaughter in the first degree to convict the defendant of carrying a dangerous weapon. His actions preceding the death of the victim—his chasing the victim down the street and pulling out the pocketknife when the "kid fell down at the corner of the sidewalk"—were sufficient to make that pocketknife a dangerous instrument. Under *Blockburger*, proving that the defendant attempted or threatened to kill the victim with the pocketknife is *not* an element of manslaughter in the first degree, and, therefore, there is no double jeopardy issue.

Furthermore, this court has already settled this question in *State* v. *Prat*, 66 Conn. App. 91, 784 A.2d 367 (2001). In that case, the defendant was convicted of assault in the first degree and carrying a dangerous instrument because he struck his victim with a baseball bat. Id., 94. We noted that assault in the first degree requires (1) intent to cause serious physical injury and (2) injury to another person by means of a deadly

weapon or instrument. Id., 104; see also General Statutes § 53a-59. That case presented a more difficult double jeopardy problem than the present case because an element of assault in the first degree is use of a "deadly weapon or a dangerous instrument . . . ." General Statutes § 53a-59 (a) (1). This court nonetheless decided that there was no such constitutional violation. *State v. Prat*, supra, 104–106.

The defendant argues, however, that an amendment to § 53-206 (a) after the assault at issue in *Prat* should change our judicial calculus. Specifically, in Public Acts 1999, No. 99-212, our legislature excised language in § 53-206 (a) that indicated that the state would not consider an object a dangerous instrument if one had "been granted a written permit" for the object.[6] General Statutes (Rev. to 1997) § 53-206 (a). The defendant maintains that the reason our court did not find a double jeopardy violation in *Prat* was because the defendant's lack of a permit for the baseball bat was an element in the dangerous instrument charge that was not required to prove the assault charge. See *State v. Prat*, supra, 66 Conn. App. 104. This is an accurate characterization of our reasoning in that case; however, we see no reason why the removal of the permit language, which occurred eight years before the crime at issue here, presents a double jeopardy issue in the present case. As stated previously, the "attempted" use of a pocketknife in a manner capable of causing death, as required under § 53a-3 (7), is an element not found in § 53a-55. While a permit to carry his pocketknife would count as an additional element unique only to the carrying

---

[6] General Statutes (Rev. to 1997) § 53-206 (a) provides in relevant part: "Any person who carries upon his person . . . any knife the edged portion of the blade of which is four inches or over in length . . . or any other dangerous or deadly weapon or instrument, *unless such person has been granted a written permit* . . . shall be fined not more than five hundred dollars or imprisoned not more than three years or both. . . ." (Emphasis added.)

a dangerous weapon statute, only one distinguishing element is needed to avoid a double jeopardy violation. Accordingly, we reject the defendant's first claim.

We now turn to the defendant's prosecutorial impropriety claim.

## II

## PROSECUTORIAL IMPROPRIETY

The defendant claims that several of the prosecutor's statements during her cross-examination of him and during her closing arguments to the jury were improper and that he was deprived of a fair trial as a result. Before addressing the merits of that claim, we first review the principles that govern our resolution of claims of prosecutorial impropriety. "As we have previously recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 458, 832 A.2d 626 (2003). "Prosecutorial [impropriety] [also] may occur in the course of cross-examination of witnesses . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see also *State* v. *Hafner*, 168 Conn. 230, 249, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975). "[T]he touchstone of due process analysis in cases of alleged prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial impropriety] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 457–58.

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 376–77, 832 A.2d 14 (2003).

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 808, 835 A.2d 977 (2003). In regard to "whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was

invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

The defendant claims that the prosecutor engaged in a pattern of prejudicial impropriety that deprived him of a fair trial. The defendant argues that at least nine of the prosecutor's statements or questions—variations of which were repeated more than once—were improper. In the interest of adjudicating this claim with ease, we rearticulate and divide the defendant's arguments under this claim into the prosecutor's statements that might be improper because they (1) were based on unreasonable inferences from the facts of the case, (2) unreasonably appeal to the emotions, passions and prejudices of the jurors or (3) express the prosecutor's opinion that the defendant was not credible. See *State* v. *Thompson*, supra, 266 Conn. 462–77. "We . . . address each [category] in turn to determine whether the particular conduct was improper before determining whether the impropriety, if any, deprived the defendant of a fair trial." *State* v. *Singh*, 259 Conn. 693, 702, 793 A.2d 226 (2002).

A

### Statements Based on Unreasonable Inferences from Fact

In advocating his position, a prosecutor may not depart from fair and reasonable inferences drawn from the facts in evidence. See *State* v. *Santiago*, 269 Conn. 726, 751–55, 850 A.2d 199 (2004) (finding that prosecutor's inflammatory questions during cross-examination without reasonable basis in evidence were improper); see also *State* v. *Pouncey*, 241 Conn. 802, 811, 699 A.2d

901 (1997) (counsel may not suggest inference from facts not in evidence); *State* v. *Bova*, 240 Conn. 210, 243, 690 A.2d 1370 (1997) (stating, "a prosecutor may argue the state's case forcefully, [and] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom"); *State* v. *Williams*, supra, 204 Conn. 544 ("A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts which have not been proven amount to unsworn testimony that is not the subject of proper closing argument. . . . It is improper for a prosecutor to use prior oral inconsistent statements substantively." [Citations omitted.]).

In *Santiago*, our Supreme Court specifically was concerned with remarks of a prosecutor during cross-examination that were not based on reasonable inferences from the record. The Supreme Court summarized the gratuitous comment in that case as follows: "During the state's cross-examination, the defendant testified that some of the differences between his statement to the police and his testimony at trial were because the police had put words in his mouth. In response, the prosecutor asked the defendant if the police had beat him up, and the defendant answered, No." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 269 Conn. 751.

Our Supreme Court "conclude[d] that the prosecutor's question to the defendant about whether the police had beaten him during his interrogation was inflammatory and without any reasonable basis in the evidence." Id., 754. The court reasoned that these comments only served to minimize the defendant's story about the events that had transpired. Id. At another point during cross-examination the prosecutor stated that after shooting the victim, the defendant threw the clothes he was wearing in the garbage—a comment that was

not based on the facts of record and which suggested the defendant's culpability. Id., 752.

Again, in *State* v. *Singh,* supra, 259 Conn. 693, our Supreme Court concluded that certain statements made by the prosecutor during closing argument that were not based on reasonable facts in the evidence, were improper. In that case, the defendant was charged with arson. During a search of the defendant's home, the police canine, accompanied by fire investigators, alerted to a pair of black loafers in the defendant's closet that contained gasoline residue, the accelerant the state contended the defendant had used to start the fire. In his defense, the defendant claimed that the dog had alerted to his loafers because he had pumped gasoline earlier that day—not because he had worn those shoes when he allegedly committed arson several days prior. In rebutting that position, the prosecutor commented: "Well, all by itself, it doesn't prove anything, but it's an amazing coincidence this dog didn't alert to anybody else's shoes. I think we can safely assume that [the fire investigators] pump gas, they are in gas stations, but even if we couldn't, the fact is that this is the guy whose shoes had gasoline on them and it is a gasoline fire." (Internal quotation marks omitted.) Id., 717.

The court found that these statements were improper because there was no evidence in the record that the fire investigators pumped their own gasoline, or that they had recently pumped gasoline while wearing the same shoes they had worn to the investigation. Id., 717–18. In another instance, the prosecutor speculated that the reason why the defendant's pants and shirts did not test positive for gasoline was because the defendant had destroyed those clothes. Again, the court deemed that speculation improper because it "suggest[ed] a

course of conduct by the defendant indicating consciousness of guilt, *for which there was no evidence."* (Emphasis added.) Id., 718.

With *Santiago* and *Singh* as our judicial benchmarks, we determine that some of the prosecutor's characterizations of the defendant and the events that transpired on the night of June 22, 2007, encouraged the jury to draw inferences from facts that were not in evidence. While "we are mindful that statements that appear to be inflammatory when analyzed in isolation may not be unfair or unduly prejudicial when viewed in the context of the entire case"; *State* v. *Bova,* supra, 240 Conn. 244; impropriety is evident in several of the prosecutor's remarks even when we consider the context. To this end, the prosecutor twice during cross-examination of the defendant accused him of "bragging about stabbing [the victim]," three times suggested that the reason why the defendant carried a pocketknife was in case he got into "fights" or had "to settle some scores like [he] did with [the victim]," and, moreover, insinuated that the defendant had started the fight that led to the victim's death when she stated on cross-examination, "and your friends walked in and started pushing those kids around and started a fight, right?" A variation on this last comment was repeated by the prosecutor three times.

In contradiction to the prosecutor's statement, there is no indication in the record that the defendant bragged about stabbing the victim.[7] The record also does not

---

[7] It appears that the prosecutor improperly based that statement on a remark by Candelario during her direct examination of him at the probable cause hearing on October 10, 2007. Candelario stated that the defendant had said, "yo le di" ("I hit him"), when the defendant joined Candelario, Torres and Sosa at the parking lot at Candelario's home after the defendant had stabbed the victim. The prosecutor stated to the jury: In Sosa's basement the defendant "brags to his friends, yo le di, I hit him . . . ." The phrase, "yo le di," does not indicate that the defendant bragged about stabbing the victim. On the contrary, when Candelario—the state's witness—was asked what that statement meant, he indicated, "[l]ike, sometimes when you're

indicate that the defendant carried a pocketknife for the purpose of "settling scores." On the contrary, the defendant's testimony indicates that he carried a pocketknife in order to execute his duties at his place of employment, an automotive garage where he periodically "[cut] rugs . . . ." Because manual work of this nature would require use of a sharp object with which to cut, the reasonable inference in this instance is that he carried the pocketknife in order to perform tasks at work rather than to "settle scores."

Moreover, in regard to the comment that the defendant and his friends instigated a fight at the party, the testimony of the defendant and Sosa indicates that the events that led to the killing of the victim *began when another partygoer pushed Torres*—not because the defendant and his friends "started pushing . . . kids around . . . ."[8]

Like the prosecutors' comments in *Santiago* and *Singh*, the inflammatory remarks of the prosecutor in the present case—namely, that the defendant had "bragg[ed]" about stabbing the victim, that the defendant carried a pocketknife to "settle scores," and that the defendant and his friends instigated the fight that led to the victim's death by "pushing . . . kids around"—were similarly inflammatory and not based on the evidence in the record. Like the prosecutors in *Santiago* and *Singh*, who suggested the guilt of their respective defendants by hazarding that each one had

nervous you say something like that." Furthermore, no other witness' testimony appears to suggest that the defendant was bragging when he said, "yo le di."

[8] The parties are also apparently in agreement on this point of fact. The state asserts in its brief that "[t]he altercation apparently began when someone pushed Torres, and it escalated when the victim aggressively confronted Torres," and the defendant states in his brief that he "and his friends arrived at the party at about 11 p.m. Almost immediately after they entered, the defendant's friend, Angelley Torres, got into a verbal altercation with another partygoer, who had pushed him."

discarded his clothing after committing crimes, the prosecutor's speculations in the present case that the defendant was the one who started the fight, carried a knife to settle scores and bragged about cutting the victim, suggests an equal degree of culpability. We, therefore, conclude that these statements were improper because they were not based on reasonable inferences from the facts in the record.

However, while we deem those statements improper, we disagree with the defendant that another remark by the prosecutor during her cross-examination of him was also improper: that the defendant stabbed the victim "over and over again." Testimony from multiple sources, including Susan Williams, an associate medical examiner, is clear that the defendant stabbed the victim at least twice. This statement is therefore not improper.

B

Statements that Unreasonably Appeal
To the Emotions, Prejudices
And Passions of the Jurors

A prosecutor may not appeal to the prejudices, emotions and passions of the jury. See *State* v. *Singh*, supra, 259 Conn. 719 ("A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant facts which are likely to skew that appraisal." [Citations omitted; internal quotation marks omitted.]); *State* v. *Williams*, supra, 204 Conn. 545 ("[a]n appeal to emotions may arise directly, or indirectly from the use of personal and degrading epithets to describe the defendant"); *State* v. *Carr*, 172 Conn. 458, 470, 374 A.2d 1107 (1977) ("a prosecutor should avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have

the effect of diverting the jury's attention from [its] duty to decide the case on the evidence").

In *Williams*, our Supreme Court found that statements a prosecutor made during cross-examination were improper because they appealed to the emotions, passions, and prejudices of the jurors. Specifically, during cross-examination, the prosecutor in that case repeatedly "called the defendant a 'coward,' and characterized him as 'hiding like a dog' when the police discovered him lying in the grass." *State* v. *Williams*, supra, 204 Conn. 546. Again, in his closing argument, the prosecutor called the defendant a "child-beater," "baby-beater" and "infant-thrasher," as well as a "liar," "drunken drug-user, convicted felon, child beater," "stupid," "savage child beater," "drunken bum," "evil man," and "a drunk who uses cocaine and smokes marijuana and beats children." (Internal quotation marks omitted.) Id. The prosecutor engaged in a similar "character assassination" of the defendant's key witness. Id., 547. In light of these remarks our Supreme Court found that "[i]t is reasonably possible that this continuous use of invective would have the improper effect of appealing to the emotions and prejudices of the jury." Id.

In the case at bar, the prosecutor, during closing argument to the jury, referred to the defendant as "hunting down his prey . . . and stabbing him to death." The second clause of this statement is not improper because it recites a fact that reasonably could be inferred from the record. And although the first clause of that statement might be somewhat sensational because it invokes the image of a predator hunting down his prey, that description is relatively benign compared to the more overt characterizations the court deemed improper in *Williams*. Moreover, our Supreme Court in *Williams*, before entering its due process analysis, found it significant that the invective used was

repeated continuously—in our case, there were no subsequent iterations of that statement.[9] This statement is therefore not improper.

Sometimes a prosecutorial statement that is sarcastic in substance can unreasonably appeal to the emotions of jurors and therefore may be found improper. See *State* v. *Santiago*, supra, 269 Conn. 752–54. In *Santiago*, for example, the court found that the sarcastic comments made by the prosecutor "exposed the jury to the prosecutor's blatant disbelief in response to the defendant's testimony and invite[d] the jury to decide the case, not according to rational appraisal of evidence, but on the basis of powerful and irrelevant factors [that were] likely to skew that appraisal." (Internal quotation marks omitted.) Id., 754. During closing argument in the case at bar, the prosecutor made a similar comment that was sarcastic: "Do you really believe that after [the defendant] stabbed the victim this many times he thought [the victim] was fine? Because if you do, I have a bog in Ireland I'd like to sell to you." Here, we note that the state's appellate attorney conceded that this statement was improper at oral argument before our court. We note further that while the jury might reasonably be able to infer from the facts in this case that the defendant did not actually believe the victim "was fine," this remark is nonetheless improper because it was a sarcastic statement that invited the jury to decide the case on its emotions rather than on a rational appraisal of the evidence. See *State* v. *Santiago*, supra, 752–54.

The analysis of the propriety of prosecutorial statements that incite the jurors' emotions, prejudices and

---

[9] It is true that the continuous use of an invective is part of the due process analysis; however, in *Williams*, the court, in finding an impropriety in these instances, but before entering its due process analysis, stated: "It is reasonably possible that this *continuous* use of invective would have the improper effect of appealing to the emotions and prejudices of the jury." (Emphasis added.) *State* v. *Williams*, supra, 204 Conn. 547.

passions changes somewhat, however, when the prosecutor's description is more than just inflammatory or flagrant like the characterizations in *Williams*, but, rather, when the statement presupposes the guilt of the defendant. "No man on trial for murder can be officially characterized as a murderer or as a cold-blooded killer, until he is adjudged guilty of murder or pleads guilty to that charge." (Internal quotation marks omitted.) *State* v. *Oehman*, 212 Conn. 325, 335, 562 A.2d 493 (1989); *State* v. *Couture*, 194 Conn. 530, 562, 482 A.2d 300 (1984). In *Couture*, the prosecutor called the defendant and his co-defendant "murderous fiends," and "utterly merciless killers . . . ." (Internal quotation marks omitted.) *State* v. *Couture*, supra, 561. Likewise, in *Oehman*, the prosecutor styled the defendant a "spoiled killer with a gun . . . ." (Internal quotation marks omitted.) *State* v. *Oehman*, supra, 335. The court in both cases held that these characterizations were accordingly improper. See id.; *State* v. *Couture*, supra, 562.

Amounting to something of a capstone on cross-examination in the case at bar, the prosecutor characterized the defendant as the victim's "judge, jury and executioner." Like the defendants in *Couture* and *Oehman*, the defendant in this case was on trial for murder. And like the prosecutors in those cases who termed their respective defendants killers, the prosecutor in this matter labeled the defendant an "executioner" who took the life of the victim. Therefore, we conclude that the prosecutor's statement that the defendant was the victim's "judge, jury and executioner" was improper.

C

Prosecutor's Opinion That Witness
Is Not Credible

A prosecutor may not express her personal opinion that a witness is not credible. See *State* v. *Thompson*,

supra, 266 Conn. 462 ("[A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position." [Internal quotation marks omitted.]).

With this rule informing our analysis, we conclude that the prosecutor's direct indictment of the defendant's credibility was improper when she stated during closing argument to the jury: "Why should you not believe this defendant? Why not just take his word that he intended to seriously physically injure him and, in fact, he died, but he didn't intend to kill him? Well, quite frankly, because he's not a credible person, is he? He's already told you that he'll lie when he wants to get something. He lied on that job application. He's a convicted felon."[10] The prosecutor continued: "He doesn't want you to believe that he intended to kill him. He wants you to believe that when he left [the victim] after repeatedly stabbing him, [the victim] was fine. That's the story he's telling you now. You have to find it beyond a reasonable doubt. The trial is a search for truth, and the physical evidence and the photographs from the medical examiner's autopsy are what you should rely on here. You shouldn't rely on the defendant's story because, as you know, he's proven himself not to be a credible person."

The prosecutor's overt characterization of the defendant as not "credible" is particularly troubling not only because it runs afoul of the prosecutor's prohibition to so characterize a defendant, but for the additional reason that it served no other purpose than to incite the emotions of the jury in contradiction to the principle

[10] At cross-examination, the defendant indicated that he did not record that he had been convicted of a felony in 2000 on a subsequent job application.

cited in part II B of this opinion. See *State* v. *Singh*, supra, 259 Conn. 719. As an additional point of reference, we recall our Supreme Court's holding in *State* v. *Reynolds*, supra, 264 Conn. 212, that a prosecutor's statements expressing his belief in the credibility of a defendant were improper. In that case, the prosecutor vouched for a witness' credibility by stating: "*You know why I believe* . . . [the witness] that there were seven shots? I'm going to tell you why *I believe* . . . [the witness] . . . . The [prosecutor] then proceeded to recite in detail the facts upon which [the witness'] testimony was based." (Emphasis in original; internal quotation marks omitted.) Id., 211. Citing its prior analysis in *Singh*, the court reasoned: "[S]uch expressions of personal opinion are a form of unsworn and unchecked testimony, and particularly difficult for the jury to ignore because of the prosecutor's special position." (Internal quotation marks omitted.) Id., 212. On this basis, the court determined that the prosecutor "improperly vouched for [the witness'] credibility when he stated that he believed [the witness'] testimony regarding the number of gunshots that the defendant had fired." Id. Like the prosecutor in *Reynolds* who improperly vouched for the witness' credibility, the prosecutor in the present case made comments indicting the defendant's credibility that were similarly improper.

While we take issue with the prosecutor's explicit indictment of the defendant's credibility, we also recognize that a prosecutor may make comments that go to the credibility issue based on the evidence at trial. This caveat is in accord with our discussion in part II A of this opinion, in which we reiterated that prosecutorial statements are proper if based on fair and reasonable inferences from the facts in the record. As our Supreme Court stressed in *Thompson*: "It is not improper for the prosecutor to comment upon the evidence presented

at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straightjacket of always using the passive voice, or continually emphasizing that he [or she] is simply saying I submit to you that is what the evidence shows, or the like." (Citation omitted; internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 465–66.

Our Supreme Court applied this principle in *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004). In that case, the prosecutor stated that the "defendant's explanation as to how he obtained money to buy drugs [was] 'totally unbelievable' . . . ." Id., 584. The defendant claimed that he had obtained money to buy drugs by "borrowing from his friends," yet testimony from the defendant's girlfriend revealed that he "begged her" for money in order to make those purchases. Id. As a result of the girlfriend's testimony, the court determined that the jury reasonably could have inferred that the defendant was being untruthful and that therefore the prosecutor's statements were not improper. Id.

In the present case, the same reasoning suggests why several of the prosecutor's statements the defendant identifies as indicting his credibility are not improper. The defendant notes that during the prosecutor's closing argument, she said to the jury, "[d]on't let him pull the wool over your eyes." Importantly, this statement is in the context of the prosecutor's recitation of facts that reasonably could have been inferred by the jury: "This is a defendant who went out of his way to avoid detection. He fled from the scene. He told his girlfriend not to tell anyone, to talk to them about what happened.

He washed off the knife and he hid it under the wheel of the trunk of his car. Finally, when he's caught, he goes to the police station, tries to shift the blame to the victim and minimize his role in this and minimize what he did. Don't let him pull the wool over your eyes. Find him guilty of the murder and find him guilty of the carry a dangerous weapon [charge]."

Although the statement, "don't let him pull the wool over your eyes," might imply that the defendant is not credible when considered in isolation, in context, the prosecutor, short of expressing her personal opinion of the defendant's credibility, was merely suggesting that there might be reason to doubt the defendant in light of his reasonably settled actions on the night of the killing. This statement therefore was not improper.

We also consider other statements of the prosecutor at closing argument flagged by the defendant as improper on the basis that they indicted his credibility: "He doesn't say anything about having been stabbed by the victim in his prior statement. Isn't that because that never happened? It's something he needed to add to the story to give himself the justification for you people as to why he was so belligerent in hunting down his prey, [the victim], and stabbing him to death. If he had honestly been stabbed by [the victim] that night, why on earth would he forget to tell the police that as he's telling them everything else? He's adding to his story. That's why he's not to be believed."

Here, the prosecutor pointed out that the defendant did not disclose in his initial statement to the police that he had been stabbed by the victim. In speculating why the defendant did not reveal this information initially but disclosed it later, the prosecutor suggested that the defendant added it to his original story to appeal to the sympathies of the trier of fact. Such an insight is not "based on [the] personal opinion" of the prosecutor

"but on the ascertainable motives of the [defendant]."
*State* v. *Stevenson*, supra, 269 Conn. 584–85. Given that
the defendant did not initially disclose a crucial mitigat-
ing piece of information but revealed it later, the jury
reasonably could infer that he was embellishing his
story. Moreover, our Supreme Court has held that "[i]t
is not improper for a prosecutor to remark on the
motives that a witness may have to lie." *State* v. *Thomp-
son*, supra, 266 Conn. 466. By conservative extension
of that principle, it was not improper for the prosecutor
in this instance to speculate as to why the defendant
might be stretching the truth.

D

Due Process Analysis

Having determined that several of the prosecutor's
statements were improper either because they departed
from reasonable inferences from the facts in the record
or unreasonably appealed to the emotions, passions
and prejudices of the jury, we now turn to whether
those improprieties taken in the aggregate "so infected
the trial with unfairness as to make the conviction a
denial of due process." (Internal quotation marks omit-
ted.) *State* v. *Singh*, supra, 259 Conn. 723. As set forth
previously, "whether prosecutorial [impropriety] was
so serious as to amount to a denial of due process, this
court, in conformity with courts in other jurisdictions,
has focused on several factors. Among them are the
extent to which the [impropriety] was invited by
defense conduct or argument . . . the severity of the
[impropriety] . . . the frequency of the [impropriety]
. . . the centrality of the [impropriety] to the critical
issues in the case . . . the strength of the curative mea-
sures adopted . . . and the strength of the state's
case." (Citations omitted.) *State* v. *Williams*, supra, 204
Conn. 540. We now apply each one of these factors
to the prosecutorial statements we have identified as

improper. On this basis, we conclude that the prosecutorial improprieties did not deprive the defendant of his right to a fair trial.

## 1

### Whether the Impropriety was Invited

The state does not claim that the defendant invited any of the improper comments, nor does our review of the record indicate that the improper statements of the prosecutor were invited by the defendant.

## 2

### The Frequency and Severity Of the Impropriety

The prosecutorial statements we have identified as improper were neither frequent nor severe. Variations of the statements we deemed improper because they were not based on reasonable inferences from the facts in evidence; see part II A of this opinion; were repeated only eight times, amidst hundreds of pages of transcript. Apart from those statements, there were only three other statements in the entirety of the trial we deemed improper: the "bog in Ireland" and "judge, jury and executioner" comments, and the prosecutor's assertion that the defendant was not "credible" because he lied about a prior conviction on a job application.

We also consider it "highly significant that defense counsel failed to object to any of the improper remarks, request curative instructions, or move for a mistrial. Defense counsel, therefore, presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 479. As our Supreme Court noted in *Stevenson*: "[C]ounsel's failure to object at trial, while not by itself *fatal* to [the] defendant's claim, frequently will

indicate on appellate review that the challenged [questions did] not deprive the defendant of his right to a fair trial." (Emphasis in original; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 594–95.

3

Centrality of the Impropriety to Critical
Issues in the Case and the Strength
Of the State's Case

Despite the defendant's argument to the contrary, the state's case against the defendant was relatively strong. In regard to the dangerous weapon conviction, it was not disputed that the defendant killed the victim with the pocketknife he had been carrying. In regard to the first degree manslaughter conviction, the only element in dispute was whether the defendant had the requisite intent to be convicted of murder, first degree manslaughter or some lesser offense. Although the defendant terms the element of intent generally "elusive," it could be more aptly characterized as readily ascertainable in this case. By the defendant's own admission, he stabbed the victim because he "wanted to make him bleed," an admission that neatly aligns with the requisite *mens rea* required by first degree manslaughter: the "intent to cause serious physical injury . . . ." General Statutes § 53a-55 (a) (1). Moreover, intent is also suggested in this case by the depth and placement of the fatal wound on the victim's body. See *State* v. *Allen*, 28 Conn. App. 81, 89–90, 611 A.2d 886 (evidence that defendant stabbed victim three times sufficient to establish requisite intent to cause serious physical injury to victim), cert. denied, 223 Conn. 920, 614 A.2d 826 (1992). Yet even if the intent element was as vigorously disputed as the defendant claims, our Supreme Court has "never stated that the state's evidence must have been overwhelming in order to support a conclusion that

prosecutorial [impropriety] did not deprive the defendant of a fair trial." *State* v. *Thompson*, supra, 266 Conn. 483.

We also note that the prosecutorial improprieties were not central to the critical issue in this case, which, as the defendant has correctly identified, was the jury's charge to determine the type of intent that governed the defendant's actions. None of the improper comments made by the prosecutor had any relation to the defendant's intent. The defendant claims that the prosecutor's comments degraded his credibility, thereby dissuading the jury from finding him guilty of the lesser included offense of second degree manslaughter. Yet it is *precisely because* the jury believed the defendant's repeated claims that he only meant to cut the victim that he was convicted of first degree manslaughter instead of murder.

### 4

### Curative Instructions

Not only did the defendant not object at trial to any of the alleged improprieties he now identifies on appeal, he also did not ask for a mistrial or request curative instructions. As our Supreme Court has stated previously, "the defendant, by failing to bring [the instances of impropriety] to the attention of the trial court, bears much of the responsibility for the fact that these claimed improprieties went uncured. We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument [or cross-examination questions] when [they were] made suggests that defense counsel did not believe that [they were] unfair in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 414.

As our Supreme Court has stated, "failure by the defendant to request specific curative instructions frequently indicates on appellate review that the challenged instruction did not deprive the defendant of a fair trial." *State* v. *Stevenson*, supra, 269 Conn. 597–98.

After a thorough examination of the prosecutor's comments under the *Williams* factors, we conclude that the prosecutor's statements that were improper did not deprive the defendant of his right to a fair trial.

The judgment is affirmed.

In this opinion ROBINSON, J., concurred.

DiPENTIMA, C. J., concurring. I agree with most of the majority's thoughtful and well reasoned opinion affirming the conviction of the defendant, Rafael Medrano. My only point of departure with the reasoning of that decision is the conclusion, found in part II C, that the prosecutor improperly expressed her personal opinion that characterized the defendant as not credible. In my view, the prosecutor's comments did not amount to an impropriety, and therefore I would not engage in a due process analysis with respect to this claim.

The defendant elected to testify in his defense. He acknowledged that he previously had been convicted of larceny in the second degree in February, 2001. During cross-examination, the defendant admitted that he had failed to include this felony conviction on an employment application.

As stated in the majority opinion, the prosecutor argued to the jury that the defendant was not a credible person and that he demonstrated this lack of credibility by omitting the prior felony conviction from his employment application. In other words, there was evidence to support the prosecutor's assertion regarding the

credibility of the defendant. I am in full agreement with the statement of the majority, with reference to *State* v. *Thompson*, 266 Conn. 440, 462, 832 A.2d 626 (2003), that a "prosecutor may not express her personal opinion that a witness is not credible." Our law, however, does permit a prosecutor to comment on the credibility of a witness "as long as the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 440, 902 A.2d 636 (2006); see also *State* v. *Long*, 293 Conn. 31, 44, 975 A.2d 660 (2009); *State* v. *Kendall*, 123 Conn. App. 625, 646–47, 2 A.3d 990, cert. denied, 299 Conn. 902, 10 A.3d 521 (2010); *State* v. *Dawes*, 122 Conn. App. 303, 311, 999 A.2d 794, cert. denied, 298 Conn. 912, 4 A.3d 834 (2010); *State* v. *Wickes*, 72 Conn. App. 380, 388, 805 A.2d 142, cert. denied, 262 Conn. 914, 811 A.2d 1294 (2002). The prosecutor's comments during closing argument regarding the credibility of the defendant constituted comment on the evidence and argument regarding inferences that the jury could draw therefrom. I conclude, therefore, that the prosecutor's comments regarding the credibility of the defendant, as set forth in part II C of the majority opinion, were not improper. Accordingly, I respectfully concur with the result reached by my colleagues.