******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PRESCOTT, J., concurring in part and dissenting in part. In the underlying criminal trial against the petitioner, Cecil Grant, the state's case was predicated almost entirely on two pieces of evidence. First, it relied on the testimony and credibility of Gustin Douglas. He implicated the petitioner in the robbery and shooting at the housing complex where Douglas lived, while simultaneously attempting to minimize or negate his own involvement and culpability in the commission of the charged offenses. Second, the state's case relied heavily on the victim's eyewitness identification of the petitioner as the shooter.

The petitioner testified at trial that he was not present during the commission of the attempted robbery and shooting and that, instead, he had been driven by his brother's fiancée, Vanessa Cooper, along with her children, to his residence in a different part of Hartford shortly before the shooting. Through his trial counsel, he also attempted to assert that Douglas participated in the robbery but had implicated the petitioner in order to minimize or eliminate his own culpability. Finally, the petitioner attempted to challenge the reliability of the victim's eyewitness identification of him as the shooter.

The majority and I apparently[1] agree that the petitioner's trial counsel, Kirstin B. Coffin, rendered constitutionally deficient performance in two ways. First, Coffin's performance was constitutionally inadequate

[1] The majority is not entirely clear regarding whether Coffin's failure to investigate or interview the other potential alibi witnesses amounted to constitutionally deficient performance. Such a conclusion may be inferred from the majority's statement in part II C of its opinion that, "we agree with the petitioner that Coffin should have, at a minimum, met with and interviewed Cooper's children to ascertain the potential benefit, if any, to having them testify on the petitioner's behalf." That statement is then followed by a determination that the petitioner nonetheless was not prejudiced. See part II C of the majority opinion.

It is equally plausible, however, that the majority merely assumes deficient performance and rejects the petitioner's claim on the prejudice prong of

because she failed to review phone records for Douglas' cell phone,[2] which, according to Douglas, the petitioner used to facilitate the commission of the crimes of which the petitioner was convicted. Second, Coffin's performance was constitutionally defective because she failed to investigate and present the testimony of one or more of Cooper's children as alibi witnesses.

Despite these instances of deficient performance, the majority concludes that they did not prejudice the petitioner. In doing so, the majority does not adequately account for the extent to which the phone records undermine the credibility of Douglas' testimony. The majority also does not adequately consider the existence of a number of factors that reduce the reliability of the victim's eyewitness identification testimony. Finally, the majority underestimates the importance that one or more additional alibi witnesses would have had on the strength of the petitioner's alibi defense by simply dismissing them as cumulative.

Accordingly, although I agree with the results reached in parts I, II A and III of the majority opinion, for the reasons that follow, I do not agree with the majority's conclusions in parts II B and C of its opinion that the petitioner failed to demonstrate that he was prejudiced by Coffin's deficient performance under the standard set forth in *Strickland* v. *Washington*, 466 U.S.

---

*Strickland.* See *Crocker* v. *Commissioner of Correction*, 220 Conn. App. 567, 583, 300 A.3d 607 ("[b]ecause both prongs [of the *Strickland* test] . . . must be established for a habeas petitioner to prevail, a court may [deny] a petitioner's claim if he fails to meet either prong" (internal quotation marks omitted)), cert. denied, 348 Conn. 911, 303 A.3d 10 (2023). Because I would conclude that counsel's performance was deficient with respect to her investigation of additional alibi witnesses, I include that analysis as part of my discussion of the petitioner's claim.

[2] The police identified Douglas' mother as the actual subscriber of the cell phone later associated with Douglas. When questioned by the police, Douglas' mother told them that the cell phone was used by Douglas. For ease of discussion, I refer to the phone as Douglas'.

668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).[3] I reach the contrary conclusion and would reverse the judgment of the habeas court and remand the matter for a new criminal trial. Accordingly, I respectfully dissent from the majority's decision to affirm the judgment of the habeas court.

I begin with a brief discussion of the instances of deficient performance, which is necessary for a more thorough understanding of how they prejudiced the petitioner's defense. Common to both aspects of defense counsel's deficient performance was her failure to properly investigate readily available evidence and witnesses, without a reasonable strategic reason for so doing. See *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 680, 51 A.3d 948 (2012) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments" (internal quotation marks omitted)); *Baillargeon* v. *Commissioner of Correction*, 67 Conn. App. 716, 721, 789 A.2d 1046 (2002) ("[b]ecause a defendant often relies heavily on counsel's independent evaluation of the charges and defenses, the right to effective assistance of counsel includes an adequate investigation of the case" (internal quotation marks omitted)).

Counsel first rendered deficient performance by failing to review Douglas' cell phone records, which were

---

[3] In *Strickland* v. *Washington*, supra, 466 U.S. 687, the United States Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel: "First, [a petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the [petitioner] by the [s]ixth [a]mendment [to the constitution of the United States]. Second, the [petitioner] must show that the deficient performance prejudiced the defense." (Internal quotation marks omitted.) Id.

of particular importance because Douglas asserted that the petitioner had used his cell phone to facilitate the attempted robbery by calling various businesses, including Pizza 101, the victim's employer. The phone records had been obtained by the police prior to trial and were readily available for review by the defense. If defense counsel had reviewed the phone records and investigated the phone numbers contained therein, she would have learned that Douglas' phone was *not* used to call Pizza 101 prior to the robbery and shooting or any other identifiable businesses. Having that information would have allowed defense counsel to directly contradict not only the testimony of Douglas but the corroborating testimony provided by Detective William J. Siemionko of the Hartford Police Department.[4]

It is, of course, axiomatic that, to demonstrate deficient performance, a petitioner must overcome the strong presumption that a "challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 689; see also *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 31, 188 A.3d 1 (2018), cert. denied sub nom. *Connecticut* v. *Skakel*, U.S. , 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019). In the present case, the petitioner met this burden because Coffin's explanation for not pursuing Douglas' phone records was not founded on any sound trial strategy but, rather, was objectively unreasonable.

At the habeas trial, Coffin testified that, at the time of the petitioner's criminal trial, the state had an "open file" policy, meaning that she had easy access to the phone records. Nevertheless, she admitted that she never reviewed the phone records herself, never hired

---

[4] Siemionko testified at the criminal trial that the phone records showed that the phone associated with Douglas was used to "call Pizza 101 prior to the pizza deliver[y] by [the victim]."

anyone to review them, and thus never considered offering them into evidence at trial. When asked to explain the rationale for her inaction, she stated a general belief that, "[s]ometimes phone records can prove to be dangerous" and that, in this case, "we did have the evidence that the call was made from . . . Douglas' phone, and I think I was just sticking with that." A proper review of the phone records, however, would have proven any such evidence false. She also stated: "I didn't want any other phone records to come in that could wind up hurting our defense." When asked, however, if she had been aware of any other phone records that could have been introduced, she responded, "[n]o."

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 680. Here, I agree with the majority's assessment that "fear of discovering evidence that might harm the client is not a proper basis for neglecting to investigate" because a minimally competent defense attorney would want to assess all of the available information about a case, both inculpatory and exculpatory, to formulate and execute an effective defense. See part II B of the majority opinion. I conclude that Coffin, by not even seeking to review the phone records, failed to exercise objectionably reasonable professional judgment, and her inaction amounts to deficient performance.

I now turn to the alibi defense. The petitioner testified at the criminal trial that, although he was at the housing complex on the night of the assault, he had been there visiting with Cooper, his brother's fiancée, and her children, and that they all drove him home prior to the events at issue. In addition to the petitioner's testimony, the defense called Cooper, who testified that the petitioner had visited with them at the housing complex

on the relevant date and that she and the children had driven the petitioner home and dropped him off prior to the time the assault occurred. Coffin did not call to testify at trial either of Cooper's children, who were fifteen and seventeen years of age at the time of the shooting, nor did she or her investigator even interview them as potential witnesses. There is no doubt that this failure constituted deficient performance under the facts of this case.

As previously stated, "[i]nadequate pretrial investigation can amount to deficient performance, satisfying prong one of *Strickland*, [because] [c]onstitutionally adequate assistance of counsel includes competent pretrial investigation. . . . Although . . . counsel need not track down each and every lead or personally investigate every evidentiary possibility before choosing a defense and developing it . . . [e]ffective assistance of counsel imposes an obligation [on] the attorney to investigate all surrounding circumstances of the case and to explore all avenues that may potentially lead to facts relevant to the defense of the case. . . . In other words, counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*." (Citations omitted; emphasis added; internal quotation marks omitted.) *Taft* v. *Commissioner of Correction*, 159 Conn. App. 537, 546–47, 124 A.3d 1, cert. denied, 320 Conn. 910, 128 A.3d 954 (2015).

"If counsel makes strategic decisions after thorough investigation, those decisions are virtually unchallengeable . . . . In particular, our habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, such as when . . . counsel learns

of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . ." (Citation omitted; internal quotation marks omitted.) Id., 547.

Although the decision whether to call a particular witness to testify is ordinarily a matter generally left to the discretion of trial counsel as a matter of trial strategy, it can constitute deficient performance not to call a particular witness if that otherwise strategic decision was unreasonable under the facts and circumstances known. This is particularly true in deciding whether to call one or more alibi witnesses. Once Coffin made the decision to pursue an alibi defense, however, she had a duty to adequately investigate, at a minimum, the substance of any potential alibi witness' testimony. That duty necessarily included interviewing Cooper's children as potential witnesses, either herself or through an investigator.

The present case is strikingly similar to our Supreme Court's decision in *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 47–61, in which that court held that trial counsel had rendered deficient performance because, despite alibi having been the primary defense, counsel failed to investigate and present testimony of an easily discoverable, disinterested alibi witness. As the court in *Skakel* stated, "[w]ith specific regard to the duty to investigate a defendant's alibi defense, counsel is obligated to make all reasonable efforts to identify *and interview* potential alibi witnesses." (Emphasis added.) Id., 35–36. The court made clear that simply deciding not to call an alibi witness without having first interviewed that witness was "objectively unreasonable because it was a decision made without undertaking a full investigation into whether [the witness] could assist in [the petitioner's] defense. . . . By failing even to contact [the witness] . . . counsel abandoned his investigation at an unreasonable juncture, making a

fully informed decision with respect to [whether to have the witness testify] impossible." (Internal quotation marks omitted.) Id., 36, quoting *Towns* v. *Smith*, 395 F.3d 251, 259 (6th Cir. 2005). The court also identified a number of nonexclusive factors that a habeas court should consider "in determining whether counsel's failure to investigate and present the testimony of an additional alibi witness or witnesses was reasonable under the circumstances. They include (1) the importance of the alibi to the defense . . . (2) the significance of the witness' testimony to the alibi . . . (3) the ease with which the witness could have been discovered . . . and (4) the gravity of the criminal charges and the magnitude of the sentence that the petitioner faced." (Citations omitted.) *Skakel* v. *Commissioner of Correction*, supra, 37.

Here, Coffin knew from Cooper's statement to the police, which was part of the police file, that her children purportedly were with Cooper and the petitioner when he was driven home. Accordingly, Coffin was aware of at least two additional potential alibi witnesses. Moreover, whereas Cooper arguably had a familial tie to the petitioner through his brother, to whom she was engaged, there was no indication in the record that the children had a familial relationship with the petitioner, and they potentially could have been viewed by the jury as more disinterested than Cooper and thus more believable. It is also entirely possible that the children's testimony regarding the petitioner's alibi may simply have been viewed as more credible than that offered by Cooper and the petitioner or that Cooper and the children's collective testimony, if relatively consistent, would have rendered the proffered alibi defense overall more credible in the eyes of at least one of the jurors. See id., 51 (multiple alibi witnesses not necessarily cumulative and potentially corroborative not only of alibi generally but also as to credibility

of each alibi witness). The younger of the two children testified at the habeas trial, and her testimony generally was consistent with Cooper's account of events. Counsel's failure even to interview the children so as to evaluate their demeanor as witnesses and ascertain the substance of their potential testimony was, as in *Skakel*, an objectively unreasonable strategic decision, especially in light of the importance of the petitioner's alibi defense, which directly countered the victim's and Douglas' identification of him as the perpetrator of the assault. See id., 37.

The majority suggests that Coffin's failure to conduct an adequate investigation of the children as potential additional alibi witnesses either did not amount to deficient performance or did not prejudice the defense because, at best, the witnesses only provided the petitioner with a partial alibi. A partial or incomplete alibi is one in which an alibi witness cannot testify with certainty that a criminal defendant was in his or her sight at the precise time that the crime was committed. I acknowledge that the court in *Skakel* observed that, "as a general rule, partial alibis are unconvincing. Indeed, it has been argued that a partial or incomplete alibi is not really an alibi in the truest sense . . . because it fails to account for a defendant's whereabouts for at least some period of time during which the crime *reasonably* could have been committed by the defendant. Thus, when a true partial alibi is at issue, it is invariably the case that the defendant just as likely could have committed the crime during a period of time not covered by the alibi." (Citation omitted; emphasis added.) Id., 68. Even a partial or incomplete alibi, however, can be important evidence for the defense; particularly if the jury believes the alibi witness or witnesses presented and has no factual basis for considering whether the petitioner might have been able to commit the crime during a period not directly covered by the

alibi testimony. See *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 571 n.27, 138 A.3d 378 (alibi witnesses' testimony concerning accused's whereabouts immediately following crime could be helpful to defense to explain or bolster alibi), cert. denied, 321 Conn. 923, 138 A.3d 284 (2016).

The petitioner testified that it was approximately a fifteen minute drive between the housing complex where the assault occurred and his home, that he was driven home by Cooper accompanied by the children, and that he was probably home by 10:45 p.m. He testified that he remained home *and was home around midnight* when the assault occurred. On the basis of this testimony alone, the petitioner presented a "complete" alibi defense. Although Cooper testified that it was her son who drove when they dropped the petitioner off, she testified, consistent with the petitioner, that he was home shortly before 11 p.m. The majority correctly notes that Cooper's daughter initially testified at the habeas trial that they dropped off the petitioner between 9 and 10 p.m., but she subsequently clarified that it was before 11 p.m. The state sought to discredit the alibi in the eyes of the jurors by highlighting the inconsistencies in Cooper's and the petitioner's versions of events, such as who was driving, and by pointing out that the petitioner claimed to be unaware of the date the assault occurred until he was arrested and yet claimed to recall the events of that day to formulate an alibi. The state never asked the petitioner or Cooper whether he had a car or some other means of returning to the housing project where the crime occurred after he was dropped off. Moreover, the state in its closing argument did not argue that the alibi defense offered was incomplete or only a partial alibi. In other words, it did not argue to the jury that the petitioner reasonably had an opportunity to commit the crime by returning to the scene after he was dropped off at home. If the

state was capable of making such an argument on the available facts, presumably it would have done so. Accordingly, because the majority's "partial alibi" discussion does not account for the petitioner's own testimony and appears to speculate about a scenario unsupported by the record, I find it unpersuasive as a basis for rejecting the petitioner's claim of deficient performance.

As with her decision not to review the phone records, Coffin did not offer an objectively reasonable reason for her failure to investigate the additional alibi witnesses. Coffin testified at the habeas trial that her decision not to call Cooper's children to testify was a strategic decision and that, generally, she avoids calling minors to testify if possible because of what she believed was a potential negative impact on the jury. Coffin stated: "It might look bad in front of the jury if the jury thinks you're hauling in children to testify, and also they'd be—proved to be a little nervous [on the witness] stand or possibility of changing their story." She also testified, however, that she did not know the ages of Cooper's children, both of whom were teenagers at the time of the assault.

"[S]trategic decisions of counsel, although not entirely immune from review, are entitled to substantial deference by the court." *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 31. To warrant such deference, however, a strategic decision must be objectively reasonable under the circumstances. See *Jordan* v. *Commissioner of Correction*, 341 Conn. 279, 291–92, 267 A.3d 120 (2021) ("our plenary review requires us, first, affirmatively to contemplate the possible strategic reasons that might have supported [trial counsel's] decisions . . . and, second, to consider whether those reasons were objectively reasonable"). Without knowing the ages of the children, or having spoken to the children, the concerns that Coffin voiced regarding calling

minor witnesses to testify amounted to pure speculation here, not an objectively reasonable strategy. Moreover, prior to deciding not to call them as witnesses, Coffin had no way of knowing what the substance of the children's testimony might have been or whether, in fact, their stories would have mirrored that of Cooper. It would have been equally important to make sure they did not have details that could have been used by prosecutors to counter the testimony of the petitioner or Cooper. In other words, Coffin did not have any factual basis on which to make a reasoned decision not to investigate the children as additional alibi witnesses, and her inaction, in my view, constituted deficient performance.

In short, counsel's performance was deficient, egregiously so, in my view. She turned a blind eye to the phone records that could have been used to contradict the testimony given by two important state's witnesses and, despite having elected to pursue an alibi defense, she failed to interview and evaluate two additional potential alibi witnesses. The majority nevertheless concludes that the petitioner failed to demonstrate that either of these deficiencies prejudiced him such that a new trial is warranted. I part ways with the majority's conclusion regarding application of the prejudice prong of *Strickland* and would instead conclude, for the reasons that follow, that counsel's deficiencies, considered in the aggregate, demonstrate prejudice warranting a new trial in this matter.

"An evaluation of the prejudice prong involves a consideration of whether there is a reasonable probability that, absent the errors, the [fact finder] would have had a reasonable doubt respecting guilt. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . We do not conduct this

inquiry in a vacuum, rather, we must consider the totality of the evidence before the judge or jury. . . . Further, we are required to undertake an objective review of the nature and strength of the state's case. . . . [S]ome errors will have had pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . [A] court making the prejudice inquiry must ask if the [petitioner] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . .

"In other words, [i]n assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable. . . . Notably, the petitioner must meet this burden not by use of speculation but by demonstrable realities." (Internal quotation marks omitted.) *Mercer* v. *Commissioner of Correction*, 222 Conn. App. 713, 730–31, 306 A.3d 1073 (2023), cert. denied, 348 Conn. 953, 309 A.3d 303 (2024).

The majority leans far too heavily on the word "substantial" in the previously cited standard. The "substantial" likelihood requirement has been used by our Supreme Court and comes from the United States Supreme Court's decision in *Harrington* v. *Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011), in which that court stated that "*Strickland* asks whether it is reasonably likely the result would have been different. . . . This does not require a showing that counsel's

actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. . . . The likelihood of a different result must be substantial, not just conceivable." (Citations omitted; internal quotation marks omitted.) Id., 111–12. In *Jones* v. *State*, 328 Conn. 84, 102, 177 A.3d 534 (2018), our Supreme Court described the *Strickland* prejudice standard as being "slightly more lenient than the more likely than not standard . . . ." Accordingly, courts considering whether a petitioner has met that burden should be cautious not to place too great a weight on the word "substantial."

In the present case, in which I conclude that the petitioner has demonstrated that counsel's performance was deficient in at least two different ways, it is appropriate in evaluating prejudice to consider the aggregate effect of counsel's deficient performance on a jury's consideration of the evidence as a whole and the reasonable inferences drawn therefrom. Although Connecticut courts have not expressly adopted this type of aggregate error approach in postconviction review; see *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 703, 159 A.3d 1112 (2017) (noting that it is "open question whether [claims of cumulative prejudicial effect of counsel's deficient performance] are cognizable under Connecticut law" and leaving issue unresolved because petitioner failed to show *any* "prejudice to aggregate"); the vast majority of federal jurisdictions and at least some state courts have done so in the context of conducting a prejudice analysis in accordance with *Strickland*.[5] See *Saunders* v. *Commissioner*

---

[5] See, e.g., *Dugas* v. *Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) ("*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced" (internal quotation marks omitted)); *Lindstadt* v. *Keane*, 239 F.3d 191, 199 (2d Cir. 2001) ("We need not decide whether one or another or less than all of these four errors would suffice, because *Strickland* directs us to look at the totality of the evidence before the judge or jury, keeping in mind that [s]ome errors . . .

*of Correction*, 343 Conn. 1, 9, 272 A.3d 169 (2022) (although federal and state court postconviction jurisprudence is not binding on this court, it is appropriate to look to such sources for guidance). Furthermore, Connecticut already considers the aggregate prejudicial effect of errors in reviewing claims of prosecutorial improprieties and whether those improprieties, considered in total, deprived a defendant of a fair trial.[6] It is consistent with that existing jurisprudence for our courts also to consider in habeas corpus proceedings the cumulative effect of multiple instances of constitutionally defective performance by criminal defense counsel.

have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. . . . We therefore consider these errors in the aggregate." (Citation omitted; internal quotation marks omitted.)); see also *Phillips* v. *State*, 285 Ga. 213, 218, 675 S.E.2d 1 (2009) ("combined effects of counsel's errors are considered in determining the prejudice prong of a claim of ineffective assistance of counsel"); *State* v. *Allen*, 378 N.C. 286, 304, 861 S.E.2d 273 (2021) (adopting reasoning of lower court that, "because [ineffective assistance of counsel] claims focus on the reasonableness of counsel's performance, courts can consider the cumulative effect of alleged errors by counsel" (internal quotation marks omitted)), rev'd in part on other grounds by *State* v. *Walker*, N.C. , 898 S.E.2d 661 (2024); *State* v. *Thiel*, 264 Wis. 2d 571, 608, 665 N.W.2d 305 (2003) (determining that counsel's performance was deficient in three ways but concluding that "we need not look at the prejudice of each deficient act or omission in isolation, because we conclude that the cumulative effect undermines our confidence in the outcome of the trial").

Only the United States Courts of Appeals for the Fourth and Eighth Circuits have expressly disallowed aggregately assessing an attorney's errors in determining whether there is *Strickland* prejudice. See B. Means, Postconviction Remedies (2023) § 30:3 (discussing cumulative error doctrine in context of ineffective assistance of counsel claims and collecting cases).

[6] "[W]hether the defendant has been prejudiced by prosecutorial [improprieties], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different *absent the sum total of the improprieties*." (Emphasis added; internal quotation marks omitted.) *State* v. *Weatherspoon*, 332 Conn. 531, 556, 212 A.3d 208 (2019); see also *State* v. *Medrano*, 131 Conn. App. 528, 553, 27 A.3d 52 (2011) ("[h]aving determined that several of the prosecutor's statements were improper . . . we now turn to whether those improprieties *taken in the aggregate* so infected the trial with unfairness as to make the conviction a denial of due

Missing from the majority opinion is any significant discussion of the relative strength, or lack thereof, of the state's case. It is axiomatic that our standard of review in evaluating prejudice requires us to "undertake an objective review of the nature and strength of the state's case." (Internal quotation marks omitted.) *Mercer* v. *Commissioner of Correction*, supra, 222 Conn. App. 730. In part II B of its opinion, the majority cites to this court's decision on direct appeal and states that "the cross corroboration of the testimony of Douglas and the victim presented a strong case against the petitioner." See *State* v. *Grant*, 154 Conn. App. 293, 328–29, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015). It is, however, precisely this inextricable connection between the testimony of Douglas and the victim that renders Coffin's deficient performance in the present case particularly harmful.

If Coffin had properly investigated Douglas' phone records, she would have learned that Douglas' phone was not used on the night in question to call and case potential robbery victims, and most certainly not to call the pizza restaurant that employed the victim.[7] This evidence would have contradicted Douglas' testimony that the petitioner had used his phone to call and locate a target, which likely would have discredited him in the eyes of the jurors. It also contradicts and thus impeaches the corroborating testimony provided by Siemionko. Demonstrating to the jury that Douglas' testimony about the petitioner using his phone to call various businesses was demonstrably incorrect would have

process" (emphasis added; internal quotation marks omitted)), aff'd, 308 Conn. 604, 65 A.3d 503 (2013).

[7] The majority states that Michael Udvardy, the private investigator who reviewed the phone records and provided a report based on his analysis of those phone records, testified that his analysis of Douglas' phone records revealed that "Douglas' phone *probably* did not call Pizza 101." (Emphasis added.) See part II B of the majority opinion. Neither Udvardy's report nor his testimony, however, equivocated about the fact that the phone records associated with Douglas revealed that the phone was not used to call Pizza 101.

raised substantial doubt as to whether he was being truthful about other events or simply was trying to shift blame away from himself. The phone records also show a gap in the use of Douglas' phone during the time of the assault, which, if the jury did not believe that Douglas had given the phone to the petitioner, supports a reasonable inference that Douglas was one of the assailants and had stopped using the phone during that period of time.

A key defense strategy had been to shift suspicion for the assault to Douglas, whose phone number was the one provided to the victim as a contact and which number the victim called for directions just prior to the assault. Throughout his testimony, Douglas both inculpated and exculpated himself, placing himself in the vicinity of the assault at the time in question while shifting focus to the petitioner and Derek Newkirk. Although the majority appears to rely on the state's argument seeking to limit the import of the phone records by suggesting that the petitioner could have used his own phone to call, this is pure speculation because no evidence was presented at trial that the petitioner used his own phone to call take-out businesses on the night in question. There is no doubt that the petitioner's attempt to raise reasonable doubt would have been substantially improved by using the cell phone records to impeach Douglas' version of events.

Additionally, although the majority properly rejects the petitioner's claim that his due process rights were violated by the admission of the victim's out-of-court identification or that Coffin rendered deficient performance in the manner in which she challenged the victim's identification of the defendant, that conclusion does not speak to the overall strength or weakness of the identification evidence. In other words, simply because the constitution does not prohibit the admission of evidence pertaining to the victim's identification

of the petitioner does not mean that its reliability is unassailable. As our Supreme Court recognized in *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), both scientific experts in the field of eyewitness identification and courts recognize that many factors can affect the accuracy of an eyewitness' identification and subsequent testimony. Of particular relevance to the present case is that "there is at best a weak correlation between a witness' confidence in his or her identification and its accuracy . . . the reliability of an identification can be diminished by a witness' focus on a weapon . . . high stress at the time of observation may render a witness less able to retain an accurate perception and memory of the observed events . . . cross-racial identifications are considerably less accurate than same race identifications . . . [and] a person's memory diminishes rapidly over a period of hours rather than days or weeks . . . ." (Footnotes omitted.) Id., 237–38. For a number of reasons, I am persuaded that the record in the present case shows that the victim's identification of the petitioner was not necessarily worthy of the weight placed on it by the majority.

First, as The Innocence Project points out in its amicus brief, circumstances at the time of the assault raise doubts about the victim's ability to make an accurate identification. The victim testified that she had never seen either man before that night. They did not stand near her window on the driver's side of her vehicle, but instead she viewed them only through the passenger side window of her car. She was only able to observe her assailants for a brief time, two or three minutes at best, before one of them drew a gun and attempted to open the passenger side door. Moreover, she also agreed with defense counsel that, during that brief time, her attention was split between the two men. The assault occurred at night, the lighting around the housing complex was less than ideal,[8] and the closest of the

---

[8] The victim testified that the lighting "was fair."

men was five or six feet away, observable only through the passenger window of the vehicle.

Second, there were problems with the victim's out-of-court identification of the petitioner. The victim's identification of the petitioner did not occur until more than fourteen weeks after the assault, which reflects a significant passage of time between the victim's observation of the petitioner and her subsequent identification of him in a photographic array. It is well settled that, because memories fade over time, an extended period of time between a crime and the subsequent identification of the perpetrator can render an identification less reliable, particularly if there was not an ample opportunity to observe the perpetrator. See id., 238 ("a person's memory diminishes rapidly over a period of hours rather than days or weeks"); cf. *State* v. *Ortiz*, 252 Conn. 533, 555, 747 A.2d 487 (2000) ("[t]he three month time period that had elapsed between the crime and the identification was deemed to be "long . . . [but] any negative aspect of both the degree of attention and the time between the crime and the confrontation is far outweighed by the opportunity to view and the level of certainty of the witness' identification" (internal quotation marks omitted)).

There were also problems with the administration of the photographic arrays shown to the victim. Detective Anthony Pia of the Hartford Police Department prepared the photographic arrays, each of which consisted of eight photos on a single page. One array contained a photo of the petitioner, and the other a photo of Newkirk, each of whom Pia knew was a suspect. Pia also administered the arrays to the victim. Thus, the police did not follow a double-blind or sequential identification procedure.[9] As our Supreme Court recognized

[9] "In a simultaneous array, all of the photographs are shown to the witness at one time. In a sequential array, the photographs are shown to the witness one at a time." *State* v. *Williams*, 146 Conn. App. 114, 129 n.16, 75 A.3d 668 (2013), aff'd, 317 Conn. 691, 119 A.3d 1194 (2015). A double-blind identifica-

in *State* v. *Guilbert*, supra, 306 Conn. 253, the use of a simultaneous and single-blind identification procedure, as was done in the present case, renders the resulting identification less reliable. This is because double-blind administration procedures "avoid the possibility of influencing the witness, whether intentionally or unintentionally, and thereby tainting the accuracy of any resulting identification." *State* v. *Marquez*, 291 Conn. 122, 167, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). In addition, the victim was Hispanic whereas the petitioner and Newkirk were black. This raises well recognized concerns regarding the reliability of cross-racial identifications. See *State* v. *Guilbert*, supra, 306 Conn. 238 ("cross-racial identifications are considerably less accurate than same race identifications").

Significantly, although the victim identified the photos of the petitioner and Newkirk on the two photographic arrays, she circled each of their photos and wrote on the instruction sheet that accompanied the array that the circled photo "is the guy that shot me," which raises doubts about the accuracy of the victim's memory of the events.[10] With respect to the petitioner's photo in the array, he was the only person wearing a hoodie, a distinct item of clothing that the victim identified to police immediately after the assault that both assailants were wearing. Furthermore, and significantly, although the police were aware of Douglas' close

tion procedure means that the person administering the photographic array to the witness also does not know the identity of the suspect. *State* v. *Outing*, 298 Conn. 34, 42, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

[10] I recognize that the state charged the petitioner as both a principal and accessory with regard to the assault, and, therefore, whether he or Newkirk was the shooter would not have mattered with respect to his criminal liability. That fact, however, does not minimize whatever confusion the victim may have exhibited in reviewing the photographic arrays and whether this was a result of a diminishment in her memories of the assault or a lack of certainty regarding her identification of the petitioner.

connection to the assault and the evidence demonstrating that he could have been one of the perpetrators, his photo was never presented to the victim in a photographic array.

Third, with respect to the victim's *in-court identification*, it is reasonable to conclude that it may have been "tainted," and thus rendered less reliable, by many of the problems already identified regarding the out-of-court identification. See generally *State* v. *Dickson*, 322 Conn. 410, 141 A.3d 810 (2016) (discussing potential that in-court identifications may be tainted by suggestive out-of-court identifications), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). Given all of these issues with the identification of the petitioner, coupled with the lack of any physical or forensic evidence tying the petitioner to the assault, I would conclude that the state's case was not particularly strong and thus far "more likely to have been affected by errors . . . ." (Internal quotation marks omitted.) *Mercer* v. *Commissioner of Correction*, supra, 222 Conn. App. 730.

With respect to counsel's deficient performance in failing to review Douglas' phone records, the majority minimizes the import of those records. A review of the phone records would have demonstrated that Siemionko incorrectly testified that the records showed that the pizza was ordered using Douglas' phone, a fact that the prosecutor highlighted during his closing argument, and, more importantly, would have provided support for the defense theory that Douglas had testified inaccurately about the petitioner using his phone to shift blame away from himself. Although the state suggests that the petitioner could have used his own phone to place the pizza order but also gave Douglas' number on the order to mask his involvement, it does not account for the reality that the state's theory of the case was that Douglas' credible testimony about the details leading up to

the assault helped to bolster the victim's identification of the petitioner and Newkirk. Any impeachment of Douglas' testimony would have been important to the defense efforts to sever this connection in the minds of the jurors.[11]

The respondent, the Commissioner of Correction, and the majority further conclude that Coffin's failure to investigate additional alibi witnesses did not prejudice the petitioner. The majority implicitly accepts Coffin's explanation that her choice to call one alibi witness was strategic, and that any additional witnesses would have been merely cumulative of that testimony and thus unlikely to have changed the outcome of the petitioner's trial. An alibi defense, however, certainly may be rendered more believable by a jury if more than one alibi witness is presented who can account for the petitioner's whereabouts at or about the time of the crime. See *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 51. This is particularly true where, as in this case, the sole alibi witness offered, Cooper, was not a disinterested observer but the fiancée of the petitioner's brother and, thus, less likely to be believed by the jury. See id. Here, as previously stated, counsel failed even to interview the other potential alibi witnesses to determine their precise relationship with the petitioner or whether one would be more persuasive than Cooper. Certainly, at some point, a court could exclude, as

---

[11] The majority downplays the significance of the phone records evidence as not *directly* contradicting other aspects of Douglas' testimony and, thus, not likely to have had an impact on the jury. It is true that a jury may "believe all or only part of a witness' testimony . . . [and that the] jury [is] free to credit one version of events over the other . . . ." (Internal quotation marks omitted.) *State* v. *Douglas C.*, 195 Conn. App. 728, 741, 227 A.3d 532 (2020), aff'd, 345 Conn. 421, 285 A.3d 1067 (2022). It is equally true, however, that, if a jury believes that a witness has been untruthful as to one aspect of his testimony, this can raise reasonable doubt as to the credibility of the remainder of his testimony, particularly in a case such as this one in which a key defense theory was that Douglas was attempting to shift blame away from himself to the petitioner.

"*needless*," multiple alibi witnesses as cumulative. (Emphasis added.) Conn. Code Evid. § 4-3. Multiple alibi witnesses, however, are not per se cumulative, as the majority suggests. Nor is it "needless" to offer more than one alibi witness, particularly if, as here, the state was able through cross-examination to highlight some factual differences in the testimony of the petitioner and Cooper as to both the relevant time period that he was with her and the children and who actually drove the car when taking him home.

Coffin's failure to investigate Douglas' phone records compromised her ability to impeach him as a witness and to lessen his credibility in the eyes of the jurors, making it less likely that the jury would regard his testimony and cooperation with the police as self-serving and intended to deflect suspicion from himself. In other words, Coffin's error significantly limited the petitioner's ability to cast Douglas as one of the victim's assailants. Moreover, Coffin's failure to call any additional alibi witnesses weakened the petitioner's closely related defense that he was not even present at the time of the shooting and therefore could not have been one of the perpetrators.

Thus, Coffin's deficiencies, considered in the aggregate, significantly compromised both prongs of the defense strategy, and, given the weaknesses in the state's case, I conclude that the petitioner satisfied his burden of demonstrating that there was a reasonable probability that, in the absence of these errors, at least one juror could have had reasonable doubt respecting his guilt, changing the outcome of the trial.

I respectfully dissent from the decision of the majority to affirm the judgment of the habeas court.